1  BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (SBN 175783)
2  Yury A. Kolesnikov (SBN 271173)
   7817 Ivanhoe Avenue, Suite 102
3  La Jolla, California  92037
   Telephone:     (858) 914-2001
4  Facsimile:     (858) 914-2002
   E-mail:        fbottini@bottinilaw.com
5                 ykolesnikov@bottinilaw.com
6
7  *Attorneys for Plaintiff Lee Voss*

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11 LEE VOSS, on behalf of himself and all others )   No.
   similarly situated and derivatively on behalf of )
12 MARVELL TECHNOLOGY GROUP, LTD.,           )   **CLASS AND SHAREHOLDER
                                             )   DERIVATIVE COMPLAINT FOR:**
13                                Plaintiff,  )
                                             )   **(1) BREACH OF FIDUCIARY
14              vs.                           )       DUTY;**
                                             )   **(2) UNJUST ENRICHMENT; and**
15 SEHAT SUTARDJA, JUERGEN GROMER,           )   **(3) BREACH OF THE DUTY OF
   JOHN G. KASSAKIAN, ARTURO KRUEGER,        )       HONEST SERVICES**
16 RANDHIR THAKUR, PANTAS SUTARDJA,          )
   WEILI DAI, and DOES 1-20,                 )   **CLASS ACTION**
17                                           )
                                Defendants,   )   **DEMAND FOR JURY TRIAL**
18                                           )
                - and -                       )
19                                           )
   MARVELL TECHNOLOGY GROUP, LTD.,           )
20                                           )
                        Nominal Defendant.    )
21 _____)

22

23

24

25

26

27

28

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation of publicly available information.

## SUMMARY OF THE ACTION

1.      This is a direct shareholder class action on behalf of shareholders of Marvell Technology Group, Ltd. ("Marvell" or the "Company"), and a shareholder derivative action on behalf of Marvell seeking to remedy wrongs committed by the Individual Defendants.  During the relevant period, certain Marvell officers and directors violated state and federal law by breaching their fiduciary duties, engaging in fraud and dishonest conduct by willfully infringing federal patents held by Carnegie Mellon University, unjustly enriching themselves at the expense of the Company, and wasting corporate assets.

2.      The Individual Defendants' conduct has damaged Marvell shareholders directly by jeopardizing and interfering with shareholders' rights to dividends.  The defendants' conduct has also damaged Marvell by causing a judgment of $1,169,140,271 to be entered against Marvell and in favor of Carnegie Mellon University ("CMU") in federal court in Pennsylvania in December 2012.  The federal court there made additional findings that the infringement was willful, thus entitling CMU to enhancement damages of up to three times the amount of the verdict.  The exact amount of the enhancement damages has not yet been determined by the court.  However, the existing judgment has required Marvell to post a bond to secure the judgment.  Since the judgment was entered, Marvell has filed multiple unsuccessful motions to have the judgment set aside.  In August 2013, Judge Nora Fischer denied Marvell's motion for a mistrial.  By order dated September 23, 2013, Judge Fischer denied Marvell's motion for judgment notwithstanding the verdict.

3.      Moreover, on February 24, 2014 Marvell filed the following Form 8-K with the SEC disclosing that the CMU judgment has impaired or may impair its ability to pay future dividends to its shareholders:

> "On February 20, 2014, Marvell announced that it had declared the payment of its quarterly dividend of $0.06 per share to be paid on March 27, 2014 to all shareholders of record as of March 13, 2014. Developments in the CMU litigation could affect Marvell's ability to pay the dividend on March 27, 2014 under Bermuda law, where Marvell is incorporated. In such event, the payment of the dividend could be delayed until such time as Marvell can meet statutory requirements under Bermuda law. The payment of future quarterly cash dividends is subject to, among other things, the best interests of its shareholders, its results of operations, cash balances and future cash requirements, financial condition, statutory requirements of Bermuda law, and other factors that the board of directors may deem relevant."

4.      The CMU verdict has a high probability of materially and adversely affecting Marvell and its cash flows, including its ability to declare and pay dividends, as disclosed by the Company in its Annual Report filed on March 27, 2014:

> "On March 6, 2009, Carnegie Mellon University ("CMU") filed a complaint in the U.S. District Court for the Western District of Pennsylvania naming Marvel Semiconductor, Inc. and us as defendants, and alleging patent infringement. CMU has asserted U.S. Patent Nos. 6,201,839 and 6,438,180 (collectively, the "CMU patents in suit"), which relate to read-channel integrated circuit devices and the HDD products incorporating such devices. A jury trial began on November 26, 2012. On December 26, 2012, a jury delivered a verdict that found the CMU patents in suit were literally and willfully infringed and valid, and awarded past damages in the amount of $1.17 billion. ***Due to the finding of willfulness during post-trial proceedings, the judge could enhance the damages by an amount up to triple the damages awarded by the jury at trial. In addition, CMU has disclosed in its post-trial motions that it is seeking pre-judgment interest up to $322 million, post-judgment interest, supplemental damages, attorneys' fees, and an injunction and/or ongoing royalties***. Post-trial motions were heard on May 1 and 2, 2013. On June 26, 2013, the District Court denied CMU's post-trial motion for attorney fees without prejudice. On August 23, 2013, the District Court denied our motion for mistrial. On September 23, 2013, the District Court denied our motion for judgment as a matter of law or a new trial on non-infringement, invalidity and other non-damages issues as well as our motion for reduced damages. On the same day, the District Court granted-in-part CMU's motion for a finding of willful infringement and enhanced damages, reserving its further rulings on any enhancement of the verdict for a forthcoming opinion. On

January 14, 2014, the District Court denied our post-trial motion on laches. We believe that there are strong grounds for appeal and we intend to vigorously challenge the District Court's judgment via an appeal to the U.S. Court of Appeals for the Federal Circuit in Washington, D.C., but there is no guarantee that we will be successful on appeal. Please see "Note 10 — Commitments and Contingencies" of our Notes to the Consolidated Financial Statements set forth in Part II, Item 8 of this Annual Report on Form 10-K for a more detailed description of a number of litigation matters we are currently engaged in. Should the District Court in the CMU case grant an injunction or if we are required to pay most or all of the damages awarded by the jury after all appeals have been exhausted, ***this could have a material adverse effect on our business, financial condition, results of operations and cash flows.***

We plan to appeal the final judgment issued by the District Court in the CMU litigation, regardless of the dollar amount of the final judgment. The parties are currently engaged in discussions before a Special Master concerning the bonding of the judgment pending appeal. During October 2013, we entered into indemnity agreements with a consortium of insurers that would potentially provide financial assurance that each of the insurers will be indemnified by us should a loss occur under a surety bond. As of February 1, 2014 and as of the date of this filing, no final judgment has been issued and no surety bond has been issued. Therefore, these indemnity agreements have had no impact to our Consolidated Balance Sheets as of February 1, 2014. We expect that under a surety bond, the surety companies would agree to guarantee to the District Court our payment of a specific amount, to be determined. However, the terms of any surety bond arrangements have not been finalized, and we cannot be certain that a surety bond will be available to us in sufficient amount to cover the full amount of a final judgment or on commercially reasonable terms. ***If we cannot obtain a surety bond in sufficient amount or on commercially reasonable terms, or if the District Court in the CMU litigation does not approve alternative arrangements to stay execution of the judgment pending our appeal, our business could be harmed. For example, if, under a surety bond, we must post our cash, cash equivalents and short term investments as collateral, we may be restricted from using such assets in the operation of our business and such assets would be classified as restricted cash in future filings***."

5.      The CMU patents currently encompass all Marvell's HD chips and the per-chip royalty will result in roughly a 20% hit to operating margins on Marvell's HD controller business. Since the HD controller business makes up approximately 50% of Marvell's sales, the ongoing impact to earnings will be highly material, and could result in a 25% reduction in net earnings for Marvell as a whole going forward.

6.      In addition to the CMU verdict, the defendants' willful violation of CMU's patents has further damages Marvell by significantly increasing its legal expenses.  As disclosed in Marvell's 2012 Annual Report, filed in March 2013:  "General and

administrative expense increased by $7.9 million in fiscal 2013 compared to fiscal 2012.

The increase was primarily attributed to an increase in legal expenses, a significant portion

of which related to the CMU trial towards the end of the fiscal year."

7.      Throughout the Relevant Period (2003 through 2013), the Individual

Defendants (as defined herein) caused the Company to issue false and misleading

statements and fail to disclose several material adverse facts about the Company's

business, operations, and prospects.  Specifically, the Individual Defendants caused the

Company to make false and/or misleading statements and/or fail to disclose: (1) that the

Company was willfully infringing patents held by Carnegie Mellon University ("CMU")

that were very material to Marvell's business and revenues; (2) that, as a result, the

Company was exposed to very material and significant damages to CMU as a result of the

patent infringement;  (3) that the Company lacked adequate internal controls; and (5) as a

result of the above, the Company's SEC filings were materially false and misleading at all

relevant times.

8.      The Individual Defendants' misconduct has damaged Marvell and its

shareholders.  Marvell has had a judgment in excess of $1 billion entered against it.

Marvell is exposed to the potential of further damages in excess of $3 billion, since the

jury found that Marvell willfully infringed CMU's patents, and the patent laws allow

damages to be trebled in such circumstances.  Marvell has incurred, or will incur, millions

of dollars in costs and fees due to defending itself in the CMU litigation.    Additionally,

the Company's goodwill and reputation have been materially undermined and tarnished as

a result of the CMU litigation.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C. § 1332.  There is complete diversity

among the parties and the amount in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Marvell maintains its principal executive offices in this district, one or more of the defendants resides in this district, a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this district, and defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.  Marvell's conduct in infringing patents held by CMU occurred in Santa Clara, California.

<u>**PARTIES**</u>

**Plaintiff**

11.     Plaintiff Lee Voss is a current Marvell shareholder and has continuously held Marvell common stock at all relevant times.  Mr. Voss is a citizen of Virginia.

**Nominal Defendant**

12.     Nominal Defendant Marvell is a Bermuda corporation with its principal executive offices located at 5488 Marvell Lane, Santa Clara, CA 95054. Marvel's stock is traded on the NASDAQ exchange under the ticker MRVL.  Marvell is a fabless semiconductor company which designs and develops a wide variety of integrated circuit devices.  Marvell has no employees located in Bermuda; all or substantially all its employees and assets are located in California.

**The Individual Defendants**

13.     Defendant Sehat Sutardja is the co-founder of Marvel and has been a director and the Chairman and CEO of Marvel at all relevant times.  Marvell represents that Sehat Sutardja is technically sophisticated with respect to Marvell's technology and that he "has been awarded more than 260 patents, recognized as the Inventor of the Year by the Silicon Valley Intellectual Property Law Association and has been named a Fellow of IEEE."  Thus, Sutardja is an expert with respect to patents, the patent application

process, and the consequences for infringing patents.  Marvell's website states the

following with respect to Sutardja:  "As co-founder of Marvell Technology Group Ltd.,

Dr. Sutardja has served as Chief Executive Officer since its inception and President from

inception until July 2013. Dr. Sutardja has also served as Co-Chairman of the Board of

Directors from inception until 2003 and as Chairman of the Board since 2003. In addition,

he serves as President, Chief Executive Officer, and as a Director of Marvell's U.S.

operating subsidiary, Marvell Semiconductor, Inc. While remaining deeply involved in the

daily challenges of running a global growth company, Dr. Sutardja participates heavily in

Marvell's engineering and marketing efforts across analog, video processor, and

microprocessor design while offering input across all of the company's other product

lines."   Before co-founding Marvell, Sutardja had worked at Micro Linear and Integrated

Information Technology, focusing on chips, digital circuits, and digital signal processors.

Sutardja holds Master of Science and PhD degrees in Electrical Engineering and Computer

Science from the University of California at Berkeley. He received a Bachelor of Science

degree in Electrical Engineering from Iowa State University.  Upon information and

belief, Sutardja is a citizen of California.

       14.      Defendant Juergen Gromer has been, at all relevant times, a member of the

Board and has been since October 2007.  Gromer serves as Chairman of Marvell's Audit

Committee and also serves on the Executive Compensation Committee and Nominating

and Governance Committee.  Gromer is the retired President of Tyco Electronics Ltd., an

electronics company, a position which he held from April 1999 until December 31, 2007.

Dr. Gromer formerly held senior management positions from 1983 to 1998 at AMP

Incorporated (acquired by Tyco International in April 1999) including Senior Vice

President of Worldwide Sales and Services, President of the Global Automotive Division,

Vice President of Central and Eastern Europe and General Manager of AMP. Gromer

received his undergraduate degree and Ph.D. in Physics from the University of Stuttgart,

Germany.  Upon information and belief, Gromer is a citizen of Germany.

15.     Defendant John G. Kassakian has been, at all relevant times, a member of the Board and has been since July 2008.  Kassakian is a member of Marvell's Audit Committee and also serves on the Executive Compensation Committee and Nominating and Governance Committee. Marvell represents that Kassakian, who holds a Ph.D., is an expert in the semiconductor field and states the following about him on the Company's website:  "Kassakian has been a member of the faculty of Electrical Engineering and Computer Science at the Massachusetts Institute of Technology ("MIT") since 1973 and has served as Director of the MIT Laboratory for Electromagnetic and Electronic Systems from 1991 to 2009. Dr. Kassakian is the founding President of the IEEE Power Electronics Society, a member of the National Academy of Engineering, and is the recipient of the IEEE Centennial Medal, the IEEE William E. Newell Award, the IEEE Power Electronics Society's Distinguished Service Award and the IEEE Millennium Medal. Dr. Kassakian's expertise in the semiconductor field and academic experience related to the technology sector makes Dr. Kassakian a valuable contributor to our board of directors." Upon information and belief, Kassakian is a citizen of Massachusetts.

16.     Defendant Pantas Sutardja is the brother of Defendant Sehat Sutardja, and is also one of the co-founders of Marvell.  During the Relevant Period. Pantas Sutardja was the Director, Vice President, Chief Technology Officer, and Chief R&D Officer at Marvell.  Collectively, Pantas Sutardja and his brother and his brother's wife (Weili Dai, who serves as Marvell's Vice President and General Manager of Communications and Consumer Business) own and control approximately 19% of Marvell's stock.

17.     Defendant Arturo Krueger is a director of Marvell and has been a director at all relevant times and since August 2005.  Mr. Krueger is the Chair of the Board's Nominating and Governance Committee and is also a member of the Board's Audit Committee and Executive Compensation Committee.  Mr. Krueger holds a MS in Electrical Engineering from the Institute of Technology in Switzerland and has studied Advanced Computer Science at the University of Minnesota.  Marvell's website states the

following about Mr. Krueger:  "Mr. Krueger has more than 40 years of experience in the

international semiconductor industry and acquired a wealth of experience in complex

systems architecture, semiconductor design and development, operations, and international

marketing, as well as general management of a large company. Since his retirement in

February 2001, Mr. Krueger has been a consultant to automobile manufacturers and to

semiconductor companies serving the automotive and telecommunication markets and is

serving on several advisory boards. Prior to his retirement in 2001, Mr. Krueger had joined

Motorola in 1996 as a systems engineer and last served as Corporate Vice President and

General Manager of Motorola Corporation's Semiconductor Products Sector for Europe,

Middle East and Africa from January 1998 until February 2001. During his time at

Motorola, Mr. Krueger served as the director of the Advanced Architectural and Design

Automation Lab. Mr. Krueger brings a deep understanding of the modern semiconductor

industry, the complex world of microelectronic systems design and architectures, and the

financial aspects of running a large company."  Krueger currently also serves on the board

of QuickLogic Corporation, another semiconductor company. Upon information and

belief, Krueger is a citizen of California.

       18.      Defendant Randhir Thakur ("Thakur") was, at all relevant times, a member

of Marvell's Board of Directors.  He is also a member of Marvell's Nominating and

Governance Committee, the Board's Audit Committee, and the Executive Compensation

Committee.   Marvell's website states the following concerning Dr. Thakur: "Dr. Randhir Thakur is

executive vice president and general manager of the Silicon Systems Group at Applied

Materials, Inc., which comprises the entire portfolio of semiconductor manufacturing

systems at Applied Materials. In this role, Dr. Thakur is responsible for strengthening

Applied Materials' leadership in its core wafer fabrication equipment markets. Since

rejoining Applied Materials in May 2008, Dr. Thakur has served in various executive

positions, including senior vice president and general manager of the Display and Thin

Film Solar group, where he led the business offering manufacturing systems for flat panel

displays and Applied Materials' thin film solar products. From 2005 to May 2008, Dr. Thakur worked at SanDisk Corporation, a supplier of innovative flash memory data storage products, where he served as executive vice president of Technology and Fab Operations and head of worldwide operations. From 2000 to 2005, Dr. Thakur held a series of progressively advancing executive roles within various semiconductor product groups at Applied Materials, including group vice president and general manager of Front End Products. Prior to joining Applied Materials in 2000, Dr. Thakur served as chief technology officer and general manager at Steag Electronic Systems, and vice president of Research Development and Technology at AG Associates, and held various technical leadership positions at Micron Technology. Dr. Thakur brings a wealth of experience in the semiconductor and consumer electronics industry, while helping to grow new markets and new products. We believe with his past and current experience in managing a large customer-focused and innovation-driven organization and various aspects of operations management and manufacturing, Dr. Thakur will be a valuable new addition to our board of directors." Dr. Thakur holds a BS with honors in Electronics and Telecommunications Engineering from the National Institute of Technology, Kurukshetra, India, a MS in Electrical Engineering from the University of Saskatchewan, Canada and a Ph.D. in Electrical Engineering from the University of Oklahoma. Dr. Thakur holds close to 300 patents and has published more than 200 papers. Upon information and belief, Thakur is a citizen of California.

19.     Defendant Weili Dai is one of Marvell's co-founders and served as Vice President, Corporate Secretary and a Director of Marvell Technology Group Ltd. since the company was established in 1995.  She has also been a Director of Marvell Technology Group Ltd. and Corporate Secretary of the Board.  Since 1999, Ms. Dai has served as Executive Vice President and General Manager of the Communications Business Group and has been responsible for managing all of the Company's communications product lines.  Ms. Dai has also served as Executive Vice President and a Director of Marvell

1   Semiconductor, Inc. since its inception. In 2006, Ms. Dai was named Chief Operating

2   Officer of Marvell.  Effective July 14, 2013, Ms. Dai was named President of Marvell

3   Technology Group, Ltd.  Prior to founding Marvell, Ms. Dai was involved in software

4   development and project management at Canon Research Center America, Inc.  Ms. Dai

5   holds a Bachelor of Science degree in Computer Science from the University of California

6   at Berkeley.  Dai is a citizen of California.

7         20.    The Defendants Identified in ¶¶13- 19 are sometimes collectively referred to

8   herein as the "Individual Defendants."

9         21.    The true names and capacities, whether individual, corporate, associate, or

10  otherwise, of Defendants named in this action as Does 1-20, inclusive, are unknown to

11  Plaintiff, who therefore sues these defendants by such fictitious names.  Plaintiff will

12  amend this complaint to show their true name(s) and capacities when they have been

13  ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of these

14  fictitiously-named defendants is responsible in some manner for the occurrences herein

15  alleged, and that the nominal defendant's injuries as herein alleged were proximately

16  caused by conduct of these fictitiously-named defendants.

17        22.    Because of their high-level positions with Marvell, each Individual

18  Defendant directed the business of Marvell and had responsibility for, control of, and/or

19  knowledge of the content and timing of all of Marvell's press releases, public filings, and

20  other public statements, including those described herein.  Further, each Individual

21  Defendant's position gave him or her access to non-public information about Marvell's

22  business, finances, products, markets, and present and future business prospects.  Each

23  Individual Defendant also knew that the unfavorable facts specified herein had not been

24  disclosed to the investing public and that the positive representations which were being

25  made were both false and misleading.

26        23.    Plaintiff is informed and believes, and on that basis alleges, that at all

27  relevant times herein mentioned, each of the defendants was the agent, principal,

28

representative, and/or employee of each of the other defendants, and, in doing the things mentioned herein, was acting within the scope of said agency, representation, and/or employment with permission of each co-defendant.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

24.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

25.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:  (i) conceal the fact that the Company was willfully infringing patents held by CMU; (ii) maintain the Individual Defendants' executive and directorial positions at Marvell and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Marvell, regarding the Individual Defendants' management of Marvell's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's chips which infringed the process patents held by CMU.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

26.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing by at least 2003 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that Marvell was willfully infringing patents held by CMU that were material to Marvell's business.

27.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently refuse to license the CMU patents after CMU put Marvell on notice of its patents beginning in 2003.[1]  After intentionally refusing to license the CMU patents, Marvell then willfully infringed CMU's patents by incorporating CMU's process patents into the technology for its products.   Because the actions described herein occurred under the authority of the Board, which to a certain extent relies on the representations of the Company's officers, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

28.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.     By reason of their positions as officers, directors and/or fiduciaries of Marvell, and because of their ability to control the business and corporate affairs of Marvell, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marvell in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the

---

[1] As alleged in more detail herein, Defendant Sehat Sutardja testified on 12/11/2012 at CMU's patent infringement trial that he was aware of CMU's patents but declined to license CMU's technology because Marvell was "not interested in using [CMU's] technology in our chip."

best interests of Marvell and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30. Each director and officer of the Company owes to Marvell and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's technology, patents, revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

31. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Marvell, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Marvell, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Marvell.

32. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marvell, and was at all times acting within the course and scope of such agency.

33. To discharge their duties, the officers and directors of Marvell were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Marvell were required to, among other things:

1     (a)    refrain from acting upon material inside corporate information to benefit

2  themselves;

3     (b)    ensure that Marvell did not infringe patents held by others;

4     (c)    ensure that the Company complied with its legal obligations and requirements,

5  including acting only within the scope of its legal authority and disseminating truthful and

6  accurate statements to the SEC and the investing public;

7     (d)    conduct the affairs of the Company in an efficient, business-like manner so as to

8  make it possible to provide the highest quality performance of its business, to avoid wasting the

9  Company's assets, and to maximize the value of the Company's stock;

10     (e)    properly and accurately guide investors and analysts as to the true financial

11  condition of the Company at any given time, including making accurate statements about the

12  Company's technology, patents, financial results and prospects, and ensuring that the Company

13  maintained an adequate system of internal controls such that the Company's financial reporting

14  would be true and accurate at all times;

15     (f)    remain informed as to how Marvell conducted its operations, and, upon receipt of

16  notice or information of patent violations or imprudent or unsound conditions or practices, make

17  reasonable inquiry in connection therewith, and take steps to correct such conditions or practices

18  and make such disclosures as necessary to comply with patent laws and federal and state

19  securities laws; and

20     (g)    ensure that the Company was operated in a diligent, honest and prudent manner in

21  compliance with all applicable federal, state and local laws, rules and regulations.

22     34.    Each Individual Defendant, by virtue of his or her position as a director

23  and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty,

24  candor, good faith and the exercise of due care and diligence in the management and

25  administration of the affairs of the Company, as well as in the use and preservation of its

26  property and assets.  The conduct of the Individual Defendants complained of herein

27  involves a knowing and culpable violation of their obligations as directors and officers of

28

Marvell, the absence of good faith on their part, a breach of defendants' duty of candor, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35. According to the Company, the primary role of the Board at the Company is to oversee management by monitoring the performance of the CEO and other senior executives and to ensure that the best interests of shareholders are being served. To satisfy this responsibility, the Board is expected to take a proactive approach to its duties and function as active monitors of corporate executives. Board members are required to provide oversight in the formulation of the long-term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals. In addition, the Board oversees and reviews the standards and policies designed and implemented by senior management to ensure that the employees and other constituents of the Company are committed to achieving corporate objectives through the highest standards of responsible conduct and ethical behavior and full compliance with legal requirements.

36. In addition, the Audit Committee members owed specific duties because of the added responsibilities of this Board subcommittee.

37. Each member of the Audit Committee is required to be, and in fact is represented by the Individual Defendants as, financially literate and have the requisite financial sophistication as required by the applicable listing standards of the Nasdaq Stock Market.

38. The purpose of the Audit Committee, pursuant to its charter, is to "assist the Board of Directors (the "Board") of Marvell Technology Group Ltd. (the "Company") in fulfilling its responsibilities for oversight of the quality and integrity of the accounting, auditing and reporting practices of the Company. The purpose of the Committee is to oversee management's conduct of the Company's accounting and financial reporting

processes, including the review of financial reports and other financial information provided by the Company to its shareholders; reviewing the Company's systems of internal accounting, financial and disclosure controls and the annual independent audit of the Company's financial statements; and appointing, retaining and overseeing the performance of independent accountants."

39.    The Audit Committee Charter states that the committee shall be responsible for the following tasks:  "The following functions shall be the ***common recurring activities of the Committee*** in carrying out its oversight function. These functions are set forth as a guide with the understanding that the Committee may diverge from this guide as appropriate given the circumstances:

■ Review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the external auditors, including the Company's disclosures under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's reports filed with the SEC and, with respect to the annual financial statements, the appropriateness and quality of accounting and auditing principles and practices as well as the adequacy of internal controls that could significantly affect the Company's financial statements;

■ Review and consider with the external auditors the matters required to be discussed by Statement of Auditing Standards ("SAS") No. 61 and No. 90 and all other applicable standards and rules, as all may be amended from time to time, relating to the conduct of the audit, other significant financial reporting issues and judgments made by management in connection with the preparation of the Company's financial statements, and any other matters communicated to the Committee by the external auditors;

■ Review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process for Forms 10-K and 10-Q about any significant deficiencies in the design or operation of internal controls or

material weaknesses therein and any fraud involving management or other employees who

have a significant role in the Company's internal controls over financial reporting; and

■ Review the independence and performance of the external auditors. With respect

to the independence of the independent auditors, the Committee shall:

■ Request from the external auditors annually, a formal written statement

delineating all relationships between the auditor and the Company required by the Public

Company Accounting Oversight Board;

■ Discuss with the external auditors any such disclosed relationships and their

impact on the outside auditor's independence; and

■ Recommend that the Board take appropriate action to oversee the independence

of the external auditors."

40.     Marvell's Executive Compensation Committee Charter states the following

with respect to the purpose of the Committee and duties of its members:  "The purpose of

the Executive Compensation Committee (the "Committee") of the Board of Directors (the

"Board") of Marvell Technology Group Ltd. (the "Company") is to:

1.   carry out the Board's overall responsibility relating to compensation of the
     Company's executive officers, as designated from time to time by the Company
     for purposes of Section 16 of the Securities Exchange Act of 1934, as amended
     (the "Exchange Act");

2.   assist the Board in establishing the appropriate incentive compensation and
     equity-based plans for the Company's executive officers and to administer such
     plans;

3.   produce an annual report on executive officer compensation for inclusion in the
     Company's annual proxy statement or annual report on Form 10-K; and

4.   perform such other duties and responsibilities enumerated in and consistent
     with this Charter.

41.     Marvell states that the following shall be "the ***common recurring duties of
the Committee*** in carrying out its oversight functions. The duties and responsibilities are

set forth below as a guide to the Committee with the understanding that the Committee

may alter or supplement them as appropriate under the circumstances to the extent

permitted by applicable law, regulation or Nasdaq Rule.

"The Committee shall:

1.   Review and approve corporate goals and objectives relevant to the compensation of the executive officers.

2.   Evaluate the performance of the executive officers in light of such goals and objectives at least annually and communicate the results to such officers and the Board.

3.   Based on the evaluation in 2. above, establish and approve annually for the Chief Executive Officer and such other executive officers, the compensation levels for those persons including, as applicable, (a) base salary, (b) bonus, (c) long-term incentive and equity compensation, and (d) any other compensation, perquisites, and special or supplemental benefits. In evaluating and determining compensation for the Chief Executive Officer and such other executive officers, the Committee shall consider the results of the most recent shareholder advisory vote on executive compensation required by Section 14A of the Exchange Act.

4.   In determining the long-term incentive component of such executive officers' compensation, consider, among other items, the Company's performance and relative shareholder return, the value of similar incentive awards to chief executive officers and other executive officers at comparable companies, and the compensation provided to each such executive officer in the past.

5.   Establish and modify the terms and conditions of employment of the executive officers, by contract or otherwise.

6.   Determine the provisions of any contracts for the executive officers that will govern the situation in which severance payments will be due upon change in control situations.

7.   Administer executive officer compensation in accordance with the terms of any applicable Company compensation plans expressly drawn or adopted for such positions.

8.   On a regular basis, but not less than annually, the Committee shall report to the Board on the Chief Executive Officer's performance and compensation and the compensation of the other executive officers. Deliberations and voting with respect to the Chief Executive Officer's compensation shall be conducted in the absence of the Chief Executive Officer.

9.  Review the Company's incentive compensation and other equity-based plans and practices and recommend changes in such plans and practices to the Board.

10. Review the Company's benefit plans (including but not limited to 401(k), employee stock purchase plan and bonus plans).

11. Administer the Company's equity incentive plans. In its administration of the plans, the Committee may, pursuant to authority delegated by the Board, (i) grant share options or share purchase rights to individuals eligible for such grants and in accordance with procedures and guidelines as may be established by the Board, and (ii) amend such share options or share purchase rights. The Committee shall also make recommendations to the Board with respect to amendments to the plans and changes in the number of shares reserved for issuance thereunder.

12. Prepare the annual report on executive officer compensation that complies with applicable law, including the Exchange Act, for inclusion in the Company's annual proxy statement. Annually review and discuss the Compensation Discussion and Analysis (the "CD&A") and related executive compensation information with management, and, if appropriate, recommend to the Board that the CD&A and related executive compensation information be included in the annual proxy statement or annual report.

13. Perform an annual performance evaluation of the Committee.

14. To review and recommend to the Board for approval the frequency with which the Company will conduct shareholder advisory votes on executive compensation ("Say on Pay Vote"), taking into account the results of the most recent shareholder advisory vote on frequency of Say on Pay Votes required by Section 14A of the Exchange Act, and review and approve the proposals regarding the Say on Pay Vote and the frequency of the Say on Pay Vote to be included in the Company's proxy statement.

15. Perform such other activities and functions related to executive officer compensation as assigned by law or the Company's Memorandum of Association or Bye-Laws, or as may be assigned from time to time by the Board.

The Committee shall ensure that compensation programs are designed to encourage high performance, promote accountability and assure that employee interests are aligned with the interests of the Company's shareholders."

42.     Marvell's Nominating and Governance Committee has the following duties, according to its Charter.  "The following shall be the ***common recurring duties of the Committee*** in carrying out its oversight functions. The duties and responsibilities are set

forth below as a guide to the Committee with the understanding that the Committee may

alter or supplement them as appropriate under the circumstances to the extent permitted by

applicable law, regulation or Nasdaq Rule.

The Committee shall:

1.   Review and report to the Board on a periodic basis with respect to matters of corporate governance (which is defined for this purpose as the relationships of the Board, the shareholders and management in determining the direction and performance of the Company).

2.   Annually review and assess the effectiveness of the Board's Corporate Guidelines and other policies essential to the sound and proper management of the Company's business.

3.   Be responsible for overseeing the Board performance evaluation process including conducting surveys of director observations, suggestions and preferences.

4.   From time to time, conduct studies of the size and composition of the Board and its committees, and periodically review with the Board and assess the criteria and requirements for Board and committee membership including without limitation, stock ownership requirements.

5.   Assist in the recruiting of directors and recommend procedures for the nomination process, and screen and recommend candidates for election to the Board and to serve as members of committees, which may include new directors for election by the shareholders and otherwise by appointment to fill vacancies and newly created directorships.

6.   Annually review and evaluate the nomination for re-election of current directors.

7.   Consider shareholder nominees for election to the Board.

8.   In connection with the review and evaluation of potential directors, periodically review the Company's Policies And Procedures For Evaluation Of Director Candidates.

9.   Oversee education and training programs for Board members.

10. Periodically review with the Chairman of the Board and the Chief Executive Officer Company leadership roles, leadership development programs, and succession plans relating to positions held by executive officers, and make recommendations to the Board with respect to selection of individuals to occupy those positions.

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

11.  Periodically review director compensation for service on the Board and recommend any changes in director compensation to the Board.

12.  Be responsible for related party transactions as follows:

(a)  The Committee shall review and approve policies and procedures with respect to proposed transactions between the Company and related parties; and

(b)  The Committee shall review and approve (including by ratification, if applicable) all such related party transactions that would require disclosure pursuant to the rules of the U.S. Securities and Exchange Commission, and other related party transactions required by Company policy to be reviewed and approved.

13.  Regularly report on Committee activities to the Board.

In performing its duties hereunder, the Committee will endeavor to comply with applicable legal requirements, including but not limited to the Sarbanes-Oxley Act of 2002, federal securities laws and the Nasdaq Rules."

## SUBSTANTIVE ALLEGATIONS

## I.  BACKGROUND

43.     Marvell was founded in 1995 by brothers Sehat and Pantas Sutardja and Sehat's wife, Weili Dai.    Defendant Dai allegedly picked the name for the company and based it on a diminution of the word "marvelous."

44.     Marvell is a fabless semiconductor company which designs and develops a wide variety of integrated circuit devices.  The Company states in its annual reports that it "is a fabless semiconductor provider of high-performance application-specific standard products (ASSPs). Our core strength of expertise is the development of complex System-on-a-Chip (SoC) devices leveraging our extensive portfolio of intellectual property (IP) in the areas of analog, mixed-signal, digital signal processing and embedded ARM-based microprocessor integrated circuits. Our product portfolio includes devices for data storage, enterprise-class Ethernet data switching, Ethernet physical-layer transceivers, handheld cellular, Ethernet-based wireless networking, personal area networking, Ethernet-based PC connectivity, control plane communications controllers, video-image processing and

power management solutions. Our products serve diverse applications used in carrier,

metropolitan, enterprise and PC-client data communications and storage systems.

Additionally, we serve the market for the convergence of voice, video and data

applications in the consumer electronics market."[2]

45.     Marvell's major customers include Fujitsu, Hitachi, IBM, Maxtor, Samsung,

Seagate Technology, Toshiba, and Western Digital.  Before such customers order

semiconductor chips from Marvell, they engage in a lengthy evaluation and

implementation process, all of which occurs at Marvell's Santa Clara, California

headquarters.

## II.     THE ONCE AND FUTURE KING AND QUEEN OF MARVELL: DEFENDANTS SUTARDJA AND DAI'S HISTORY OF SELF-DEALING AND DISHONESTY, BLESSED AND APPROVED BY A SUPINE BOARD

46.     This action involves the defendants' dishonesty and lack of candor with

respect willful infringement of patents held by Carnegie Mellon University ("CMU").

Defendants' wrongdoing in this regard has caused Marvell to be damaged in excess of $1

billion, while the Individual Defendants named herein have benefitted themselves

financially by tens of millions of dollars.

47.     A review of defendants' past wrongdoing at Marvell is illuminating to

demonstrate defendants' pattern and practice of breaching their fiduciary duties in a willful

and dishonest manner to benefit themselves financially at the expense of Marvell and its

public, minority shareholders.  Defendants' past and current conduct constitutes a fraud on

the minority shareholders, as that term is understood under Bermuda law.

48.     In 2006, the same year Defendant Dai was named COO, Marvell received a

letter of informal inquiry from the Securities and Exchange Commission (SEC) requesting

certain documents relating to the company's stock option grants and practices.

---

[2] This quotation is taken from Marvell's 2008 Annual Report on Form 10-K, at p. 4.

49.     At Marvell, the same day the SEC probe was announced, the U.S. Attorney's office in San Francisco served the company with a grand jury subpoena for stock options records. Ten months later, on May 7, 2007, a two-person Special Committee appointed by Marvell's board to investigate the company's practices concluded that Marvell had backdated options and that Sutardja had participated in the backdating in some cases.

50.     In a typical backdating scheme, directors or executives granted options at the then current stock price. Later, they cherry-picked a time from the past when the price was lower, calling that the grant date, to boost the value of the shares.  Backdating violates federal securities laws if companies fail to account for options paid to employees, as Marvell failed to do.  On May 7, 2007, Marvell said it would restate its financial results by as much as $350 million.  The ultimate amount of the restatement ended up being $327 million.

51.     Backdating is a bald-faced lie, represents *ultra vires* conduct, and constitutes a breach of the duty of candor.

52.     ``The Special Committee found a systemic failure of internal controls,'' Marvell said in an SEC filing at the time.  Marvell stock, which had climbed to a split-adjusted record $35.32 on Jan. 27, 2006, plunged 53 percent to $16.37 on May 21, 2007, destroying more than $10 billion in market value.

53.     Marvell's Special Committee, after concluding that Marvell's executives and directors had backdated options, recommended several remedial actions, including stripping Defendant Sehat Sutardja (the CEO of Marvell) of his Chairman duties and terminating the services of Ms. Dai, who was said to bear a certain amount "of responsibility for these deficiencies." The Board ignored these decisions, choosing instead to "demote" Ms. Dai and to appoint an independent lead director (temporarily) instead of reducing the CEO's control of the board.

54.     The fact that the husband/wife duo of Defendants Sehat Sutardja and Weili Dai ignored governance changes recommended by the allegedly independent Board

members, despite their highly unethical and unlawful behavior, amply demonstrates that Sutardja and Dai exercise unfettered control of Marvell's operations.  Such domination and control of Marvell's Board by Sutardja and Dai persists to this day.

55.     Both shareholder lawsuits and news articles at the time noted that from 2001 to 2006, Defendants Sehat Sutardja and Ms. Dai (along with fellow officers and directors) received *more than $760 million from the sale of 36 million Marvell shares*, *most of which were backdated*.[3] As a Bloomberg article noted, "In a setup that differs from that at most companies, Sutardja and Dai were the sole members of the committee that doled out options. It's unusual to have a married couple occupying the senior executive positions in a company, let alone allow them to be in charge of handing out stock-based compensation"[4]

56.     Defendant Dai has been reported to order Italian designer furniture from Gianni Versace for Marvell's lobby, and for herself a red Ferrari F430 with a custom license plate reading "Marvell."

57.     In response to the enormous self-dealing by defendants with respect to backdating of stock options at Marvell, shareholders filed a shareholder derivative action in this Court on November 1, 2006.  On March 20, 2009, the case was settled and a Stipulation of Settlement was filed with the Court.  The defendants paid $54,994,726 to settle the case, plus additional corporate governance changes.  Defendants in that case included some of the defendants named herein, including Sehat and Pantas Sutardja, Weili Dai, and Arturo Krueger.  Defendant Gromer filed a declaration in support of the settlement, stating that he and Defendant Kassakian had approved the settlement.

---

[3] *See, e.g.,* "Billionaires from Jakarta, Shanghai Undermined by Options," BLOOMBERG, May 21, 2007.

[4] *Id.*

58.   Similar wrongdoing involving backdating of stock options at Marvell, and lying to shareholders about it, gave rise to a shareholder class action lawsuit, also filed in this Court.  Marvell was damaged in that case, which ended up settling for $72 million. Judge Whyte entered final judgment on November 13, 2009.

59.   Defendant Dai also entered into a settlement with the SEC in which she consented to a permanent injunction against any future violations of various provisions of the federal securities laws, agreed not to serve as a director or officer of a public company for a period of five years, and paid a civil penalty of $500,000. According to the WALL STREET JOURNAL, the SEC said the size of the fines "partly reflect that the company didn't follow the recommendation to fire her. According to the SEC's complaint, Ms. Dai didn't cooperate with the agency's investigators and invoked her Fifth Amendment right against self-incrimination when asked 'substantive questions' by SEC staff."

60.   Despite the settlement and her five-year ban on serving as an executive officer, Defendant Dai continued to be generously compensated. Immediately after her "resignation" in 2007, she received an enormous options grant of 6,888,798 shares in 2007.  In 2008, she again received a second outsized grant of 7,387,067 options.  In 2007 and 2008, she received total compensation from Marvell of 7,380,600 and 7,672,111, respectively.

61.    In 2012, Dai received the following compensation package approved by the company's Audit Committee and Executive Compensation Committee:

   1.    a $400,000 bonus;

   2.    an increase in her annual base salary to $510,000 (from 500,000);

   3.    a bonus participation target for Ms. Dai equal to 80% of her base pay;

   4.    a mega-grant of 800,000 options with service-based vesting; and

   5.    a grant of 80,000 restricted stock units with service-based vesting.

62.   Altogether, Defendant Dai received 2012 compensation of approximately $6 million, an amount that makes her the second highest paid named executive officer (NEO)

1   at Marvell, if she were allowed to be called an "executive."  This represented self-dealing

2   conduct countenanced and approved by the Compensation Committee (Defendants

3   Gromer, Kassakian, Thakur and Krueger), who approved compensation to Dai

4   commensurate with that of an executive officer during the time that Dai was banned by her

5   settlement with the SEC from serving as an executive officer of Marvell.

6        63.    Unsurprisingly, as soon as Dai's five-year ban from serving as an executive

7   officer of Marvell expired, the Board promptly named Dai President of the Company,

8   effective July 14, 2013.  The king and queen were back on their thrones.

9        64.    As part of the stock option backdating scandal at Marvell, the Company's

10  own General Counsel alleged in a whistleblower lawsuit that both Defendants Sehat

11  Sutardja and Arturo Krueger pressured him to lie.  *See Matthew Gloss v. Marvell*

12  *Semiconductor, Inc. and Marvell Technology Group, Ltd.*, Case No. 2009-SOX-00011

13  (U.S. Dept. of Labor, Office of Administrative Law Judges, San Francisco, CA).  In

14  declarations submitted under penalty of perjury, Marvell's former General Counsel

15  Matthew Gloss stated that on the evening of October 25, 2006, the day before he was

16  scheduled to have his third interview with the Special Committee which had been

17  appointed to investigate the stock option backdating at Marvell, Defendant Sehat Sutardja

18  called him at his home in an apparent effort to influence his testimony. Gloss Decl. ¶ 3.

19  CEO Sutardja also indicated that he could not attest to the accuracy of certain records from

20  Stock Options Committee meetings with Chief Operating Officer Weili Dai ("COO Dai").

21  *Id.* Gloss also stated in his sworn declaration that, on October 26, 2006, he mentioned the

22  phone call with CEO Sutardja during his interview with Special Committee's counsel

23  Matthew Jacobs. *Id.* Gloss alleges that following the interview, Defendant Krueger

24  reprimanded him for disclosing the phone call with CEO Sutardja to Jacobs. Gloss Decl. ¶

25  4. Gloss further stated that Krueger suggested that he should have lied about the nature of

26  the phone call with CEO Sutardja. *Id.*

27

28

65.     In his declaration, Gloss further stated that he reported both the Sutardja phone call and the Krueger conversation to Marvell's Chief Financial Officer George Hervey ("CFO Hervey") and Vice President of World Wide Human Resources Michelle Oakes in early November 2006. Gloss Decl., ¶ 5. He also stated he discussed the matter with Doug King, Chair of the company's Audit Committee in mid-January, 2007. Gloss Decl., ¶ 7.  On February 7, 2007, Gloss met with King a second time, providing him with a letter questioning Krueger's independence on the Special Committee. Gloss expressed similar concerns in a document he submitted to the SEC the following day. Gloss Decl., ¶ 8.

66.     Gloss' declaration further stated that Gloss reiterated his concerns about the independence of the Special Committee during his final interview with Jacobs on February 13, 2007. Gloss Decl., ¶ 9.   In response to Gloss's allegations, Marvell asked King to conduct an investigation. King hired retired Federal Judge Abraham Sofaer to assist with the investigation.  Judge Sofaer, in turn, hired outside counsel to aid him in his task. Id.

67.     As a result of Gloss's allegations, Marvell delayed the Special Committee's investigation.  Gloss stated that, as a result of his complaints, his responsibilities as General Counsel were curtailed in November 2006 and transferred to a junior attorney. Gloss Decl. ¶ 6. He further stated in his declaration that, on March 26, 2007, he was terminated without explanation and barred from his office. Gloss Decl. ¶ 6.

68.     Gloss filed a whistleblower lawsuit under the Sarbanes-Oxley Act, claiming that his termination was in retaliation for his reports of unlawful conduct by Marvell's executives, including Sehat Sutardja, Weili Dai, and Arturo Krueger.  The lawsuit was subsequently dismissed by the Administrative Law Judge in an opinion dated June 24, 2009 on statute of limitations grounds since Gloss had filed his lawsuit more than 90 days following his termination, which shortened period Marvell had apparently forced Gloss to agree to when he started working at Marvell.

69.     In addition to backdating stock options, the Defendants have been alleged to have engaged in substantial wrongdoing in litigation involving intellectual property.

## III.     THE DEFENDANTS' HISTORY OF ALLEGED THEFT OF INTELLECTUAL PROPERTY

70.     In April 2001, Marvell started talks to acquire telecommunications chip technology from Jasmine Networks Inc., a San Jose-based competitor.  As the companies were negotiating, Marvell executives were conspiring with some of Jasmine's senior managers to steal its trade secrets, a breach of contract lawsuit Jasmine filed in September 2001 in Santa Clara County Superior Court alleged. The suit sought $40 million in damages from Marvell. In a cross-complaint in 2005, Marvell rejected Jasmine's allegations. Marvell alleged that Jasmine itself had stolen the technology and had fraudulently misrepresented it as its own. In its lawsuit, Jasmine contended that Alba directed Marvell's action with the support of Sehat Sutardja.

71.     Jasmine's key evidence was a recorded conversation of Marvell General Counsel Matthew Gloss, Vice President Kaushik Banerjee and in-house patent attorney Eric Janofsky on Aug. 16, 2001.

72.     The three men had called Jasmine lawyer Virginia Wei and got a voice mail greeting. Forgetting to hang up, the men discussed the legal peril of Marvell's dealings with Jasmine.  Their conversation was captured on Wei's voice mail system. Gloss said, ``Sehat doesn't go to jail, obviously'' according to a transcript published in a California appellate opinion written by Presiding Justice Conrad Rushing in 2004. Referring to Alba, Gloss says, ``Manuel might go to jail; Manuel gets a black eye.'' Later, Janofsky says, ``If we took that IP on the pretense of just evaluating it and put it in our product?''

73.     Justice Rushing found the remark about intellectual property showed Marvell executives were discussing fraud. His ruling overturned a lower court order that had barred Jasmine from using the recording.  After proceeding in appellate court, the case

1  was remanded to Superior Court for trial.  A jury eventually ruled in Marvell's favor, and

2  Jasmine appealed.

3  ### IV.  THE DEFENDANTS CAUSE MARVELL TO WILLFULLY INFRINGE
4  ### PATENTS OWNED BY CARNEGIE MELLON UNIVERSITY

5  74.    During the relevant time period, Carnegie Mellon University ("CMU")

6  owned valuable patents that Marvell willfully infringed, resulting in a jury awarding a

7  verdict against Marvell and in CMU's favor in December 2012 for $1,169,140,27.[5]  The

8  United States District Court for the Western District of Pennsylvania is currently

9  considering a motion by CMU to enhance that judgment by up to three times based on

10  findings that Marvell willfully infringed CMU's patents.

11  75.    The patents which Marvell willfully infringed were critical to Marvell's

12  business.  The jury made findings of fact that Marvell sold 2.34 billion chips which had

13  technology based on the infringed patents between March 6, 2003 and July 28, 2012.  The

14  average revenue for Marvell of such chips was $4.42, and the average profit per chip was

15  $2.16.

16  76.    Because of the critical nature of the patents to Marvell's business, the

17  decision with respect to the infringement of CMU's patents were made by the defendants

18  named herein – the controlling directors and executives of Marvell, who are all extremely

19  knowledgeable about patents and patent law and several of whom have personally

20  registered hundreds of patents.  They acted intentionally, willfully, and in a dishonest

21  manner with respect to the infringement of CMU's patents, and their conduct has caused

22  Marvell and its shareholders to be damaged in an amount in excess of $1 billion.  Their

23  conduct has further infringed rights personal to Marvell's shareholders since the

---

[5] *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, Case No. 09-cv-00290 (W.D. Pa.).

1 | defendants' wrongdoing has interfered with Marvell's ability to declare and pay dividends

2 | to Plaintiff and the other Marvell shareholders.

3 | 77. Marvell knew about CMU's patents beginning at least in 2002. One of the

4 | important engineers at Marvell who worked on the relevant technology was Gregory Burd,

5 | who had joined Marvell in 1999. In January 2002, Burd sent two emails to Toai Doan,

6 | who was then his boss at Marvell. Doan was a manager and principal engineer of signal

7 | processing at Marvell and later Vice President of read channel development. In his

8 | January 2002 email to Doan, Burd told Doan that CMU owned patents to the technology

9 | Marvell was interested in and working on, which was referred to as the "Kavcic method"

10 | after its inventor of the same name (Dr. Kavcic) from CMU. One of Burd's acting

11 | managers at Marvell was also Dr. Nersi Nazari. Nazari was Dr. Kavcic's main contact at

12 | Marvell.

13 | 78. Further, in August 2003, CMU's Technology Transfer representative Carl

14 | Mahler sent a letter to Defendant Pantas Sutardja and to Marvell's General Counsel,

15 | Matthew Gloss, inquiring as to whether Marvell would be interested in licensing the

16 | relevant patents owned by CMU – the '180 and '839 patents.[6] CMU stated in the letter

17 | that "I have taken the liberty of including copies of these patents along with this letter" and

18 | indicated "I would be happy to work with you to negotiate a license to these patents if that

19 | would be of interest to you."

20 | 79. Mahler had sent the same letter at the same time to Fujitsu. Thus, Fujitsu

21 | was also on notice of CMU's patents in this area. Fujitsu was one of Marvell's customers

22 | in the read channel area, and thus became concerned about CMU's patents because it

23 | perceived Marvell's products to contain the same technology covered by CMU's patents

24 | disclosed by CMU in Mahler's letter. As a result, in November 2004 Fujitsu employee

25 |

26 | [6] The full name of the patents is US Patent No. 6,201,839 B1 and US Patent No. 6,438,180 B1.

27 |

28 |

1    Junya Suwanai wrote a letter to Marvell, noting that Fujitsu had received Mahler's August

2    2003 letter offering to license CMU's patented technology and asking Marvell whether its

3    products infringed on CMU's patents.  Fujitsu asked for a response from Marvell by the

4    end of the month.  It is not known whether Marvell ever responded (at least in writing) to

5    Fujitsu's letter, but the record from the proceedings in CMU's subsequent patent

6    infringement case in Pittsburgh indicates that Marvell did not produce any responsive

7    letters.

8         80.    Thus, beginning at least 2002, Marvell had actual knowledge of CMU's

9    patents and intellectual property, and was given an opportunity to license the patents.

10        81.    In CMU's patent infringement trial, CMU was required to prove that

11   Marvell had the specific intent to encourage others to infringe CMU's patents, which can

12   be demonstrated if Marvell caused, urged, encouraged, or aided the infringing conduct.

13   On this point, the Court found that CMU introduced sufficient evidence at trial that

14   Marvell aided its customers' infringement by producing chips that used the accused

15   methods and instructed its customers to use the chips in infringing modes. (Docket No.

16   677 at 180-183; Docket No. 678 at 91; Pl. Exs. 1913; 1918; 1919).[7] Specifically, CMU

17   entered into evidence emails, firmware, as well as programming instructions for hardware

18   showing that Marvell directed its customers, including Western Digital, Samsung, and

19   Toshiba, to use the chips in infringing modes. (Pl. Exs. 730; 932; 1914; 1915; 1918; 1919).

20        82.    Defendant Sehat Sutardja also had actual knowledge of CMU's patents and

21   willfully and intentionally caused Marvell to disregard those patents.  At trial, Sehat

22   Sutardja testified that he was aware of the August 2003 letter from CMU and stated that

23

24

25   _____

26   [7] These references are to the docket in the CMU action, *Carnegie Mellon University v. Marvell
     Technology Group, Ltd.*, Case No. 09-cv-00290 (W.D. Pa.).

27

28

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

1    Marvell did not respond to such letter because Marvell was "not interested in using the

2    technology in our chip." (Docket No. 707 at 91).

3        83.    Defendant Sehat Sutardja is an expert with respect to patents, having been

4    awarded over 260 patents.  In addition to having served as Chairman of Marvell since

5    2003, he has served at all relevant times as President, Chief Executive Officer, and as a

6    Director of Marvell's U.S. operating subsidiary, Marvell Semiconductor, Inc.  He is a very

7    "hands on" manager, as he testified at the CMU patent infringement trial, and as Marvell

8    acknowledges on its website:  "While remaining deeply involved in the daily challenges of

9    running a global growth company, Dr. Sutardja participates heavily in Marvell's

10   engineering and marketing efforts across analog, video processor, and microprocessor

11   design while offering input across all of the company's other product lines."  During the

12   relevant time period, Dr. Sutardja generally held weekly staff meetings with his senior

13   vice-presidents, at which he was presented with weekly status reports.[8]

14       84.    The defendants also had actual knowledge during the relevant time period

15   that Marvell was not able to successfully develop and patent its own technology to address

16   key issues with its products and that the key technology to address such issues was held by

17   CMU.  For example, Defendant Sehat Sutardja received an email on February 6, 2007

18   from Gregory Burd, who stated:  "We did not do a comparison with linear Viterbi since

19   nowadays drives are dominated by media noise and MNP or NLV is a must."  As Dr.

20   Sutardja testified at trial, MNP and NLV referred to technology covered by CMU's

21   patents.  During the relevant period, Marvell employees recognized that its own internal

22   technology was woefully inadequate and did not sufficiently address media noise

23   problems.  Marvell's own inferior technology was referred to by Marvell itself as "coffee

24

25   ───────────────────

26   [8] Dr. Sutardja testified that these meetings were attended, at a minimum, by Marvell vice
     presidents Dr. Armstrong, Mr. Brennan, Mr. Doan, and Dr. Wu.

27

28

1   warmers" because it used so much electricity and was ineffective.  As a result, Marvell did

2   not use its own defective and inadequate technology in its chips but instead used CMU's

3   technology, without licensing it.

4       85.    Further, after receiving actual notice of CMU's patents, Defendants Sehat

5   and Pantas Sutardja also failed to cause Marvell's employees to take any significant action

6   to investigate whether Marvell and others were infringing CMU's patents.  At trial, the

7   evidence demonstrated this and that, to the contrary, the Sutardja brothers encouraged

8   Marvell employees to continue working on Marvell products that infringed CMU's

9   patents.  As the Court noted in a September 23, 2013 order denying Marvell's motion to

10  set aside the verdict for insufficient evidence:  "Despite knowing about the patents-in-suit,

11  the evidence presented at trial reveals that Marvell made little effort to determine whether

12  it was infringing these patents. Dr. Wu, Mr. Burd, and Mr. Doan all state that they decided

13  not to read the patent claims, even though email correspondence indicates that both were

14  aware that Dr. Kavcic had patented his algorithm. (Pl. Ex. 280; Pl. Ex. 283). If believed,

15  this behavior is a clear sign they disregarded a high likelihood of infringement. Once

16  presented with the patents, Mr. Doan did not conduct further investigations on his own, tell

17  others to investigate or send the patents to Marvell's legal team.72 (Docket No. 761 at Jt. Ex. C

18  at 125-130). Instead, he directed his employees to continue working to capture the realized

19  gain and reported that his employees would continue to work on the "Kavcic model." (*Id.* at

20  Ex. D at 190-191; Pl. Ex. 285). This occurred around the time that he was promoted from his

21  position as principal engineer of the signal processing group to Vice President of read channel

22  development. (Docket No. 761 at Jt. Ex. C at 16-17).  While Marvell alleges that the MNP is a

23  suboptimal version of Dr. Kavcic's work, Dr. Wu's 2003 email to Doan stated that he and

24  Burd were implementing an approach that "turns out to be the original structure that Kavcic

25  proposed in his paper." (Pl. Ex. 366; Docket No. 677 at 134-135)."

26      86.    The evidence at the CMU trial further established willfulness because it was

27  established that Marvell failed to follow its own internal policy concerning steps to be taken

28

1    when risks concerning potential patent infringement are made known to the Company: "These

2    failed opportunities to investigate engendered a great deal of risk that Marvell's engineers

3    infringed CMU's patents. Moreover, the lack of action by Marvell's employees does not

4    conform to Marvell's own purported IP policy, which according to the testimony of Dr.

5    Armstrong, Marvell's Vice President of Marketing, requires that any such information about

6    patents be forwarded to the legal department for analysis. (Docket No. 761 at Jt. Ex. C at 294-

7    295). Despite this, Dr. Armstrong stated that he did not know whether the CMU Patents were

8    ever submitted to the legal department according to this policy. (*Id.* at 295, 299). He further

9    testified that he was not aware of any internal discussion about licensing the patents from

10   CMU given Fujitsu's letter request. (*Id.*)"[9]

11           87.      In finding that the evidence adduced at the CMU trial was sufficient to

12   establish willful infringement, the Court further stated: "Marvell's lack of inquiry about the

13   possibility of infringement also meant that it took no effort to avoid infringement of the subject

14   patents. This fact was specifically corroborated by Mr. Burd, who stated that he was not aware

15   of any measures being taken to stop using the CMU Patents. (Docket No. 678 at 101). Marvell

16   is a sophisticated entity with nearly 3,000 patents.  (Docket No. 707 at 53). Yet, it took

17   absolutely no steps to investigate these patents before producing 2.3 billion chips, despite the

18   fact that the technology was *named* after Dr. Kavcic, one of the inventors of the CMU

19   Patents.[73] To this day, Marvell continues to use the Accused Technology. In fact, at trial Mr.

20   Burd testified that Marvell had no plans to discontinue using the technology. (Docket No. 678

21   at 101). Only as of July 2013—seven months after the verdict—is it beginning to design

22   around the technology. (Docket Nos. 889; 898)."[10]

23

24   [9] Quote is from Court's September 23, 2013 Order denying Marvell's motion to set aside the

25   verdict, at p. 70.

26   [10] Quote is from Court's September 23, 2013 Order denying Marvell's motion to set aside the
     verdict, at pp. 70-71.

27

28

88.     "Succinctly put, Burd presented his superiors at Marvell with a product named "KavcicPP" and noted that Dr. Kavcic held a patent on such a detection scheme, yet nothing was apparently done to investigate infringement, reach out to Dr. Kavcic or CMU, or respond to CMU and Fujitsu's inquiries on same. Accordingly, CMU has shown that Marvell's behavior created an objectively high risk of infringement. *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1348 (Fed. Cir. 2011) (failure to investigate the patent situation is a consideration that tends to establish willful infringement)."[11]

89.     Defendants' willful infringement and wrongful conduct was also noted by the Court (Hon. Nora Fischer, presiding) in the CMU trial on several occasions.  The Court noted that Marvell tap-danced around a "reliance on counsel" defense.  It did not assert an actual reliance on counsel defense, apparently because it did not want to waive the privilege and be forced to produce communications to and from its lawyers.  But, as the Court noted: "Marvell, however, has expressly stated throughout this litigation that it is not raising advice of counsel as a defense to the willfulness claims. (Docket No. 174-1 at 77-78). To that end, the Court on December 20, 2012 ruled that Marvell could not at trial – "without putting the actual communications from counsel at issue – argue that its receipt of a patent implies or suggests that Marvell's counsel returned a favorable opinion that Marvell's NLD-type and MNP-type chips and simulators and the Kavcic-Viterbi simulator do not practice the patented methods of the asserted claims." (Docket No. 753). ***Despite this, Marvell's counsel attempted to imply at closing that its engineers had vetted this patent with counsel based on snippets of Dr. Wu's testimony. (Docket No. 759 at 79-80).***"[12]   (emphasis added).  In response to the attempt by

---

[11] Quote is from Court's September 23, 2013 Order denying Marvell's motion to set aside the verdict, at p. 71.

[12] Quote is from Court's September 23, 2013 Order denying Marvell's motion to set aside the verdict, at p. 74.

1  Marvell's counsel at closing argument to suggest that Marvell had vetted the patent with

2  counsel, the Court observed:  "The Court has doubts about the credibility of certain

3  testimony[79] regarding this consultation and the reasonableness of this defense, given its years

4  of involvement with this matter.[80]"  In footnote 79 which accompanied the immediately

5  preceding quote, the Court stated:  "As the Court recounted in its opinion on Marvell's

6  Motion for a Mistrial, (Docket No. 900), Dr. Wu during his testimony clenched his jaw,

7  drank an entire pitcher of water, generally appeared uncomfortable, and continuously

8  looked at Dr. Sutardja in the back of the courtroom throughout his appearance as a

9  witness. In this Court's estimation, the jury could have easily found Dr. Wu was not

10  credible given his demeanor on the stand. On this and all other areas of inquiry, the jury

11  was charged to weigh witness testimony and give it the appropriate weight it deserved or

12  discredit the testimony completely. *See, e.g.*, *Barber v. CSX Distribution Servs.*, 68 F.3d

13  694, 700 (3d Cir. 1995)."

14          90.     In addition to the actual knowledge of Marvell's patent infringement by

15  defendants Sehat and Pantas Sutardja, the other director defendants either knew or

16  recklessly disregarded Marvell's infringement of CMU's patents.  Indeed, in 2009 CMU

17  filed its patent infringement lawsuit against Marvell.  Thus, at least beginning in 2009,

18  director defendants Gromer, Kassakian, Krueger and Thakur, as well as Weili Dai, had

19  actual knowledge that CMU alleged infringement by Marvell.  These defendants are all

20  highly sophisticated in technology companies and patents.  For example, Dr. Thakur has

21  been issued close to 300 patents.  Thakur is currently executive vice president and general

22  manager of the Silicon Systems Group at Applied Materials, Inc., which comprises the

23  entire portfolio of semiconductor manufacturing systems at Applied Materials. In this role,

24  Dr. Thakur is responsible for strengthening Applied Materials' market in its core wafer

25  fabrication equipment markets.  Dr. Thakur holds a BS with honors in Electronics and

26  Telecommunications Engineering from the National Institute of Technology, Kurukshetra,

27

28

1  India, an MS in Electrical Engineering from the University of Saskatchewan, Canada and

2  a Ph.D. in Electrical Engineering from the University of Oklahoma.

3        91.     Likewise, Defendant Krueger has more than 40 years of experience in the

4  international semiconductor industry and acquired a wealth of experience in complex

5  systems architecture, semiconductor design and development, operations, and international

6  marketing, as well as general management of a large company.  Krueger holds a MS in

7  Electrical Engineering from the Institute of Technology in Switzerland and has studied

8  Advanced Computer Science at the University of Minnesota.

9        92.     Defendant Kassakian holds S.B., S.M., E.E. and Sc.D. degrees from MIT

10  and has been a member of the faculty of Electrical Engineering and Computer Science at

11  the Massachusetts Institute of Technology ("MIT") since 1973 and served as Director of

12  the MIT Laboratory for Electromagnetic and Electronic Systems from 1991 to 2009. Dr.

13  Kassakian is the founding President of the IEEE Power Electronics Society and is a

14  member of the National Academy of Engineering.  Marvell's website touts Dr.

15  Kassakian's "expertise in the semiconductor field and academic experience related to the

16  technology sector" as positive factors that qualify him to sit on Marvell's board.

17        93.     Likewise, Defendant Gromer is sophisticated in the fields of engineering and

18  patents.  He received his undergraduate degree and Ph.D. in Physics from the University of

19  Stuttgart, Germany.  Gromer is the retired President of Tyco Electronics Ltd., an

20  electronics company, a position which he held from April 1999 until December 31, 2007.

21  Dr. Gromer formerly held senior management positions from 1983 to 1998 at AMP

22  Incorporated (acquired by Tyco International in April 1999) including Senior Vice

23  President of Worldwide Sales and Services, President of the Global Automotive Division,

24  Vice President of Central and Eastern Europe and General Manager of AMP.

25        94.     Defendant Dai had actual knowledge of these facts because of her position

26  with Marvell and because of daily communications she has with her husband, Defendant

27  Sehat Sutardja.

28

95.     Thus, because of their educational background, work experience, relationship with Sehat and Pantas Sutardja, and experience in applying for patents and/or reviewing the value and importance of patents to the companies they have worked for, Defendants Gromer, Kassakian, Krueger, Dai and Thakur were particularly suited to evaluate the materiality of the relevant patents and technology to Marvell's business, revenues, and profits.  When CMU sued Marvell for patent infringement in 2009, Defendants Gromer, Kassakian, Krueger, Dai and Thakur were required to conduct an investigation into the allegations and determine if the allegations had merit.  Upon information and belief, they conducted such an investigation and determined that Marvell had actually infringed the patents or that there was a significant likelihood that Marvell had infringed CMU's patents.  Nonetheless, they failed to take appropriate action.

96.     Among other things, upon being presented with evidence of Marvell's infringement, Defendants Gromer, Kassakian, Krueger, Dai and Thakur could have and should have caused Marvell to settle the case at a reasonable cost.  The evidence at trial demonstrates that CMU acted reasonably at all times and would have accepted a reasonable settlement offer.  Marvell's own expert at trial suggested that a reasonable license for CMU's patents would be a one-time royalty of $250,000.  Tellingly, Marvell rejected CMU's reasonable offers to allow Marvell to license its patents back in 2003.

97.     While it is unknown what Marvell could have negotiated as a reasonable license fee back in 2003, any such license would have cost Marvell far less than the $1 billion verdict.  Moreover, again, once CMU filed its lawsuit in 2009, Marvell could have negotiated a reasonable settlement far below $1 billion. It refused to do so and instead actually continued to willfully infringe CMU's patents, even after the lawsuit was filed.  As Judge Fischer noted, ***the director defendants, including Defendants Gromer, Kassakian, Krueger, Dai and Thakur, caused Marvell to willfully infringe CMU's patents <u>even after the jury verdict was returned in December 2012</u>***.  ***<u>Marvell did not stop</u>***

1  ***selling the infringing chips until July 2013, six months after the jury verdict was***
2  ***entered***.

3          98.    Thus, Defendants Gromer, Kassakian, Krueger, Dai and Thakur breached
4  their duty of candor and acted in bad faith and in a dishonest manner by refusing to cause
5  Marvell to settle the CMU lawsuit for a reasonable sum and by increasing Marvell's
6  damages by causing Marvell to continue to sell the infringing chips even after the jury
7  verdict was entered.

8          99.    Moreover, by refusing to settle the CMU suit in bad faith, Defendants
9  Gromer, Kassakian, Krueger, Dai and Thakur have now exposed Marvell to further
10 substantial damages.  Had Defendants Gromer, Kassakian, Krueger, Dai and Thakur acted
11 reasonably and in good faith and settled the CMU lawsuit for a reasonable amount,
12 Marvell would have avoided any exposure for willful infringement.  Because the
13 defendants allowed the case to go to the jury, however, ***Marvell is now exposed to treble***
14 ***damages*** since the jury made substantial findings that Marvell willfully infringed CMU's
15 patents.  Thus, the $1,169,140,271 in damages Marvell is currently obligated to pay CMU
16 could be increased to ***as high as $3,507,420,813!***

17        100.    Analysts noted the huge damage which has been caused to Marvell due to
18 the CMU judgment, and which will continue to be caused.  A January 9, 2013 article in
19 GMI Ratings entitled "Can Only SpiderMan Save Marvell Technology Group?" noted:

20      "While it is important to note that the $1.17 billion verdict is subject to appeal, there
21 is also a possibility that the damages could triple to about $3.5 billion—an amount that is
22 dangerously close to the company's current market cap value of $4.2 billion—since jurors
23 found Marvell's patent infringement was willful. In addition to the $1.17 billion jury
24 award, Marvell is required to make 50-cent royalty payments on all infringing HD
25 controller chips sold in the future. According to a report on Seeking Alpha, ***the CMU***
26 ***patents "currently encompass all of Marvell's HD chips [and] the per-chip royalty will***
27 ***result in roughly a 20% hit to operating margins on their HD controller business."*** The

28

report goes on to say that "*since the HD controller business makes up approximately 50% of Marvell's sales, the ongoing impact to earnings will be astounding, and could result in a 25% reduction in net earnings for Marvell as a whole going forward.*"

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

101.   In addition to willfully infringing CMU's patents during the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements which failed to disclose the fact that Marvell was willfully infringing CMU's patents and instead falsely stated or implied that Marvell had patents covering all its key technology and/or had paid appropriate licenses to persons who held patents for the relevant technology.

102.   <u>False Statements in Marvell's 2007 Annual Report</u>:  Marvell's 2007 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about July 2, 2007.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, Arturo Krueger, and non-defendant Michael Tate, among others.  In the 2007 Annual Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, and Arturo Krueger caused Marvell to make the following false and misleading statements about Marvell's intellectual property and patents:

"<u>Intellectual Property</u>

Our future revenue growth and overall success depend in large part on our ability to protect our intellectual property. We rely on a combination of patents, copyrights, trademarks, trade secret laws, contractual provisions and licenses to protect our intellectual property. We also enter into confidentiality agreements with our employees, consultants, suppliers and customers and seek to control access to, and distribution of, our documentation and other proprietary information. Despite these precautions, it may be possible for a third-party to copy or otherwise obtain and use our products and technology without authorization, develop similar technology independently or design around our patents. *In addition, we often incorporate the intellectual property of other companies into our designs, and we have certain obligations with respect to the non-use and non-disclosure of their intellectual property.* It is possible, however, that the steps taken by us to prevent

misappropriation or infringement of our intellectual property or our customers' intellectual property may not be successful."

103.    Why the statement was false:  The italicized statement above in Marvell's 2007 Annual Report was false and misleading because it failed to disclose to Marvell's shareholders that Marvell **had actually incorporated CMU's intellectual property into its chip designs but failed to pay a licensing fee to CMU for use of CMU's patents**.  The Individual Defendants, as alleged in great detail herein, knew this statement, as well as the further statements identified below, were false because they had received notice of CMU's patents in 2002 and 2003, along with an invitation to license the patents, but declined to license the patents and instead instructed Marvell employees to incorporate CMU's intellectual property into Marvell's chip designs illegally, and without paying the necessary license.  The amounts involved were highly material to Marvell's results and operations, as reflected in the eventual jury verdict against Marvell for willful patent infringement.

104.    False Statement:  Marvell's 2007 Annual Report also stated:

**As of January 27, 2007, we have been issued or have acquired 406 United States patents and 72 non-United States patents on various aspects of our technology, with expiration dates ranging from 2008 to 2025. We have filed a number of additional patent applications in the United States and other countries.**

·  ·  ·

We have expended and will continue to expend considerable resources in establishing a patent position designed to protect our intellectual property. While **our ability to compete is enhanced by our ability to protect our intellectual property**, we believe that in view of the rapid pace of technological change, **the combination of the technical experience and innovative skills of our employees may be as important to our business as the legal protection of our patents and other proprietary information**.

**From time to time, we may desire or be required to renew or to obtain licenses from third parties in order to further develop and effectively market commercially viable products. We cannot be sure that any necessary licenses will be available or will be available on commercially reasonable terms.**

105.   <u>Why the statements were false</u>:  The italicized statement above in Marvell's 2007 Annual Report was false and misleading because it suggested that Marvell had intellectual property or patents covering all the technology it incorporated into its chip designs and chips.  The statements told shareholders and the stock market that Marvell's business and success were the product of *its patents*, and that its ability to protect *its intellectual property* enhanced Marvell's "ability to compete" in the marketplace and vis-à-vis its competitors.  The statements also falsely told investors that "the technical experience and innovative skills of our employees may be as important to our business as the legal protection of our patents and other proprietary information."  Both of these statements were false and misleading half-truths since:  (1) Marvell did not disclose that a huge and material portion of its chip designs and chips relied on CMU's patents, which Marvell was willfully infringing, and not on any patents or IP owned by Marvell; and (2) Marvell's employees, regardless of whether they did or did not have experience and innovate skills in general, were not using any of their innovative skills or experience in developing the Company's NLD, MNP, and EMNP chips (as well as the simulators associated with developing such chips and the related technology)[13] but instead were intentionally and illegally copying CMU's intellectual property and patents without negotiating or paying a licensing fee to CMU.  Moreover, the statement "From time to time, we may desire or be required to renew or to obtain licenses from third parties in order to further develop and effectively market commercially viable products" was false and misleading because the Individual Defendants knew, but omitted to disclose, that Marvell was intentionally and illegally copying CMU's intellectual property and patents without negotiating or paying a licensing fee to CMU.

---

[13] CMU's patents relate to read-channel integrated circuit devices and the HDD products incorporating such devices.

106.   <u>False Statement</u>:  Marvell's 2007 Annual Report also falsely stated that its products were based on its own proprietary technology, and failed to disclose that the products were actually based on CMU's patented and proprietary technology and that Marvell was willfully infringing CMU's patents.  The 2007 Annual Report specifically made these statements with respect to Marvell's Read Channel circuits and System on a Chip ("SOC") product, an integrated drive electronics platform.  Both Marvell's Read Channel circuits and its SOC products incorporated Marvell's MNP, EMNP-type, and NLD type chips, all of which were proven at the CMU patent trial to infringe CMU's patents.  With respect to Marvell's Read Channel and SOC products, the 2007 Annual Report stated:

**Our Markets and Products**

We target computers, communications-related equipment and consumer devices that require integrated circuit devices for high-speed data storage, transmission, and management. We also target a broad range of electronic products that can utilize our power management solutions. Additionally, we are developing new products that are targeted for new markets that we currently do not serve. Our current product offerings are primarily targeted at three main markets: business enterprise, consumer and emerging markets.

***We offer our customers in these markets a wide range of integrated circuit solutions using proprietary Communications Mixed-Signal Processing, or CMSP, and digital signal processing technologies. We are applying our*** analog, mixed-signal, digital signal processing, embedded microprocessor and ***complex digital design technologies in a variety of applications.*** Our broad product portfolio consists of storage, switching, transceivers, cellular and handheld, wireless, PC connectivity, gateways, communications controllers and power management products.

**Storage Products**

We offer a broad range of storage products for hard disk drive and tape drive electronics and storage interconnect technology. Also, we recently developed our first optical storage products for DVD recorders that will be used in computer applications.

**<u>Read Channel</u>**.   A read channel is an integrated circuit that provides the interface between the analog signals stored on magnetic disk drives and the digital signals that computers can understand and manipulate. ***The performance of the read channel normally drives the performance of the overall storage system. <u>We utilize</u>***

*advanced mixed-signal and digital signal processing technologies in our array of partial response maximum likelihood, or PRML read channel products. Our technology incorporates an efficient data-encoding scheme in addition to advanced digital filtering and data-detection techniques.* Our read channel products are designed to allow customers to achieve high areal density in addition to fast data transfer rates for their hard disk drives. *Our read channels utilize custom digital and analog blocks running at a very high frequency while achieving low power consumption.*

Our read channel integrated circuits target specific feature and performance requirements of the enterprise, desktop and mobile computing markets. Our strategy is to consolidate the signal processing algorithms required by each of our different market segments into a single integrated circuit design. This consolidation can result in cost savings and reduced product line complexity.

System-On-Chip. *Our integrated drive electronics platform is a flexible system-on-a-chip, or SOC solution that provides increased performance, reduced power consumption and cost savings essential for next-generation hard disk drives. Utilizing our leading-edge read channel physical layer devices* as the core for integration, we have the flexibility to either add any number of functional blocks available in our portfolio or to integrate customer provided intellectual property. With our high data transfer rates, our integrated SOC platform provides solutions that have the ability to span multiple product generations, allowing for risk-reduction, cost savings and accelerated time-to-market. Our integrated SOC platform is designed to provide a solution for enterprise, desktop and mobile systems. Our current SOC products incorporate the read channel, hard disk controller, embedded memory and one or more microprocessors into a single integrated circuit.

107.  Why Statements Were False – The statements referenced above about Marvell's Read Channel and SOC products were false and misleading because they stated and/or implied that such products were based on Marvell's own proprietary technology and patents, and did not disclose that Marvell's Read Channel circuits and its SOC products incorporated Marvell's MNP, EMNP-type, and NLD type chips, all of which infringed CMU's patents.  Marvell used CMU's technology and patents in its Read Channel and SOC products precisely because CMU's technology and patents were far superior to any technology Marvell had developed.  Indeed, the evidence at the CMU trial demonstrated that Marvell's technology for the Read Channel products was referred to by

Marvell employees as "coffee warmers" because it used so much power. CMU's technology, in stark contrasts, allowed higher performance and less power consumption. Thus, the statement quoted above from the 2007 Annual Report that "Our read channels utilize custom digital and analog blocks running at a very high frequency while achieving low power consumption" was false and misleading because Defendants failed to disclose that it was CMU's technology, not Marvell's, that was the cause of these benefits, and that Marvell was using CMU's patented technology without negotiating and paying a necessary license or royalty.

108.   <u>Statements in Marvell's 2008 Annual Report</u>:  Marvell's 2008 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about March 28, 2008.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, Arturo Krueger, and Juergen Gromer, among others.  In the 2008 Annual Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, Arturo Krueger, and Juergen Gromer caused Marvell to make the same false and misleading statements as were made in the 2007 Annual Report.  A true and correct copy of such false statements from the 2008 Annual Report is attached hereto as **Ex. 1**, and incorporated herein by reference.  Those statements were false and misleading for the same reasons stated *supra* in ¶107.

109.   <u>False Statements in 2009 Annual Report</u>:  Marvell's 2009 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about March 31, 2009.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer, and non-defendant Clyde R. Hosein, among others.  In the 2009 Annual

Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer caused Marvell to make the same false and misleading statements as those made in the 2007 and 2008 Annual Reports.  A true and correct copy of such false statements from the 2009 Annual Report is attached hereto as **Ex. 2**, and incorporated herein by reference.  Those statements were false and misleading for the same reasons stated *supra* in ¶107.

110.  <u>False Statements in Marvell's 2010 Annual Report</u>:  Marvell's 2010 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about March 30, 2010.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer, and non-defendant Clyde R. Hosein, among others.  In the 2010 Annual Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer caused Marvell to make substantially similar false and misleading statements as those made in the 2007-2009 Annual Reports.  A true and correct copy of such false statements from the 2010 Annual Report is attached hereto as **Ex. 3**, and incorporated herein by reference.  Those statements were false and misleading for the same reasons stated *supra* in ¶107.

111.  The statements in the 2010 Annual Report concerning Marvell's Read Channel products were slightly different than in previous years, and emphasized to even a greater degree that it was Marvell's technology and that such technology gave it a competitive edge.  The 2010 Annual Report stated:

Overview

We are a fabless semiconductor provider of high-performance application-specific standard products. ***Our core strength of expertise is the development of complex System-on-a-Chip ("SoC") devices leveraging our extensive technology portfolio of intellectual property*** in the areas of analog, mixed-signal, digital signal processing and embedded ARM-based microprocessor integrated circuits.

112.    The 2010 Annual Report also stated:

Storage Products

We offer a broad range of storage products targeted for hard disk drives, tape drive electronics, optical disk drives, solid-state flash drives and storage subsystems technology. We offer both discrete components targeted at specific storage-class requirements, as well as complex SoC solutions, which integrate multiple functional blocks onto a single device.

*Storage System-on-a-Chip*:   *Our integrated drive electronics platform is a flexible SoC solution that provides increased performance, reduced power consumption and cost savings essential for next-generation hard disk drives.* We provide Storage SoC solutions for enterprise, desktop and mobile storage systems.

Utilizing *our leading-edge read channel devices* as the core for integration, we have the flexibility to either add any number of functional blocks available in our portfolio or to integrate customer provided intellectual property. With our high data transfer rates, *our advanced SoC platform* provides solutions that have the ability to span multiple product generations, allowing for product life cycle risk-reduction, lower cost of ownership and accelerated time-to-market.

*Our current SoC products incorporate the read channel, hard disk controller ("HDC"), embedded memory and one or more Marvell designed ARM-microprocessors into a single integrated circuit*.

*Read Channel:* A read channel is a mixed-signal integrated circuit that provides the interface between the analog signals stored on magnetic disk drives and the digital signals that computers can understand and manipulate. *The performance of the read channel is a key factor to the overall performance of the hard disk drive storage system.* Read channel performance is measured as a function of the signal-to-noise ratio ("SNR"). The higher the SNR value of a read channel circuit, the better the circuit is able to separate valid data from system induced noise. *Our ability to consistently develop multiple generations of read channel circuits with industry leading SNR performance has enabled our customers to improve finished drive yields and to yield higher density drives given a fixed aerial density platter*.

*In the development of our read channel products we utilize advanced mixed-signal and digital signal processing technologies*. Our read channel devices utilize a variety of advanced signaling algorithms including advanced partial response maximum likelihood (Advanced PMRL) or the low density parity check ("LDPC") algorithm. We anticipate the majority of our future storage SoC solutions for high-density drives will be based on LDPC read channel technology. Our technology incorporates an efficient data-encoding scheme in addition to advanced digital

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

filtering and data-detection techniques. Our read channel products are designed to allow customers to achieve high areal density in addition to fast data transfer rates for their hard disk drives. Our read channels utilize custom digital and analog blocks running at a very high frequency while achieving low power consumption.

113.    Why Statements Were False – These statements in the 2010 Annual Report were false and misleading for the same reasons noted in ¶107.

114.    False Statements in the 2011 Annual Report:  Marvell's 2011 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about March 25, 2011.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, Juergen Gromer, and non-defendant Clyde R. Hosein, among others.  In the 2011 Annual Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, Juergen Gromer caused Marvell to make substantially similar false and misleading statements as those made in the 2007-2010 Annual Reports.   A true and correct copy of such false statements from the 2011 Annual Report is attached hereto as **Ex. 4**, and incorporated herein by reference.  Those statements were false and misleading for the same reasons stated *supra* in ¶107.

115.    The statements in the 2011 Annual Report concerning Marvell's Read Channel products were slightly different than in previous years, and emphasized to even a greater degree that it was Marvell's technology and that such technology gave it a competitive edge.  The 2011 Annual Report stated:

> <u>*Read Channel:*</u>    A read channel is a mixed-signal integrated circuit that provides the interface between the analog signals stored on magnetic disk drives and the digital signals that computers can understand and manipulate. The performance of the read channel is a key factor to the overall performance of the hard disk drive storage system. Read channel performance is measured as a function of the signal-to-noise ratio ("SNR"). ***The higher the SNR value of a read channel circuit, the better the circuit is able to separate valid data from system induced noise. Our ability to consistently develop multiple generations of read channel circuits with industry leading SNR performance has enabled our customers to improve***

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

*finished drive yields and to yield higher density drives given a fixed aerial density platter.*

*In the development of our read channel products we utilize advanced mixed-signal and digital signal processing technologies. Our read channel devices utilize a variety of advanced signaling algorithms including advanced partial response maximum likelihood or the low density parity check ("LDPC") algorithm. We anticipate the majority of our future storage SoC solutions for high-density drives will be based on LDPC read channel technology. Our technology incorporates an efficient data-encoding scheme in addition to advanced digital filtering and data-detection techniques.* Our read channel products are designed to allow customers to achieve high areal density in addition to fast data transfer rates for their hard disk drives. *Our read channels utilize custom digital and analog blocks running at a very high frequency while achieving low power consumption.*

116.    <u>Why the Statements Were False:</u>  The italicized statements above in Marvell's 2011 Annual Report were false and misleading because they suggested Marvell had developed and could consistently develop multiple generations of superior Read Channel products based on its own proprietary technology. This was false because Marvell's Read Channel products did not rely upon Marvell's technology for their advances but instead relied upon infringed CMU patents.  The statements were also false because they failed to disclose to Marvell's shareholders that the relevant read channel products were actually developed based on technologies belonging to CMU which were protected by patent but were literally and willfully infringed by Marvell.

117.    <u>False Statements in Marvell's 2012 Annual Report:</u>  Marvell's 2012 Annual Report was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about March 27, 2012.  It was drafted, reviewed, approved, and signed by the Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer, and non-defendant Clyde R. Hosein, among others. In the 2012 Annual Report, Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, and Juergen Gromer caused Marvell to make substantially similar false and misleading statements as those made in the prior annual reports.  The exact false

1    statements made are reflected in the highlighted portions of the 2012 Annual Report which

2    are attached hereto as **Ex. 5.** Those statements were false and misleading for the same

3    reasons stated *supra* in ¶107.

4        118.    <u>False Statements in the 2013 Annual Report</u>:  Marvell's 2013 Annual Report

5    was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about

6    March 29, 2013.  It was drafted, reviewed, approved, and signed by the Individual

7    Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo Krueger, Juergen

8    Gromer, Randhir Thakur and non-defendant Brad D. Feller.  In the 2013 Annual Report,

9    Individual Defendants Sehat Sutardja, Pantas Sutardja, John G. Kassakian, Arturo

10   Krueger, Juergen Gromer, and Randhir Thakur caused Marvell to make substantially

11   similar false and misleading statements as those made in the prior annual reports noted

12   above.  The exact false statements made are reflected in the highlighted portions of the

13   2013 Annual Report which are attached hereto as **Ex. 6.** Those statements were false and

14   misleading for the same reasons stated *supra* in ¶107.

15       119.    <u>False Statements in the 2014 Annual Report</u>:  Marvell's 2014 Annual Report

16   was filed with the SEC on Form 10-K and mailed to Marvell's shareholders on or about

17   March 27, 2014.  It was drafted, reviewed, approved, and signed by the Individual

18   Defendants Sehat Sutardja, John G. Kassakian, Arturo Krueger, Juergen Gromer, Randhir

19   Thakur and non-defendant Michael Rashkin.  In the 2013 Annual Report, Individual

20   Defendants Sehat Sutardja, John G. Kassakian, Arturo Krueger, Juergen Gromer, and

21   Randhir Thakur caused Marvell to make substantially similar false and misleading

22   statements as those identified in the prior annual reports identified above.  The exact false

23   statements made are reflected in the highlighted portions of the 2014 Annual Report which

24   are attached hereto as **Ex. 7.** Those statements were false and misleading for the same

25   reasons stated *supra* in ¶107.

26

27

28

THE UNJUST COMPENSATION PAID TO DEFENDANTS

120.     During the time they were causing Marvell to willfully infringe CMU's patents and exposing Marvell to billions of dollars in damages, the Defendants were paid excessive and unjust compensation.

121.     During the relevant time period, most of the defendants' compensation from Marvell was incentive-based compensation.  As such, it was only earned if Marvell met or exceeded certain performance goals.  Those goals, and the formulas governing whether the defendants' incentive-based compensation was earned for each relevant year, are set forth in the Company's proxy statements on Form 14A filed with the SEC.

122.     For example, for the performance-based awards (options or RSUs) given by Marvell during the relevant time period to Sehat Sutardja, whether Sutardja received the awards and, if so, the amount, was based on (a) earnings per share during 2008 (Marvell had to realize EPS of at least $1.06); (b) Relative Operating Margin in 2009 (operating margin achieved by Marvell for the year had to be at or above the 60th percentile  of a Performance Peer Group); (c) Revenue and Operating Margin for 2011 (revenue growth had to be 10-25% higher than 2010; non-GAAP operating margin had to be between 23.5% and 26%).  In the 2010 Proxy Statement, Marvell also disclosed that 75% of Sehat Sutardja's compensation was tied to performance of the Company, and that the performance-based compensation would only be realized if Marvell achieved performance goals that aligned with the 75th percentile of a peer group of other companies:  "The executive compensation committee approved a target compensation package for Dr. Sehat Sutardja for fiscal 2011 that aligns with the 75th percentile of the peer group.  This package is intended to have approximately 75% of total compensation value tied to performance, and will only align with the 75th percentile of the peer group if Dr. Sehat Sutardja achieves performance conditions."  *See* Marvell's 2010 Proxy Statement, at p. 28.  In describing why Marvell's Executive Compensation Committee (Defendants Gromer, Kassakian, and Krueger) awarded a generous compensation package to Dr. Sehat Sutardja, the Proxy stated that Sutardja "sets our strategic vision and manages the day-to-day operations of the business.  Importantly, he

plays a lead role in mapping our innovation and R&D vision which is foundational to future shareholder value creation.  With over 150 patents, his personal leadership in the advancement of our technology is critical to achieving our business objectives." *See* Marvell's 2010 Proxy Statement, at pp. 28-29. This statement was false and misleading because the Proxy did not reveal that Sutardja's "personal leadership" in the management of the day-to-day operations of Marvell included willful infringement of the CMU patents, and that far from contributing to "future shareholder value creation," Sutardja's dishonest and willful patent infringement would result in the destruction of shareholder value to the tune of over $1 billion.

123.    Pantas Sutardja's performance-based awards (options or RSUs) were also premised on Marvell achieving certain benchmarks.  Pantas Sutardja's awards were based on EPS in 2008 (Marvell had to achieve EPS of $1.06 or more) and were based on revenue growth in 2011.

124.    Pursuant to the formulas and factors set forth in Marvell's Proxy Statements, defendants Sehat Sutardja, Weili Dai, and Pantas Sutardja were paid the following incentive-based compensation during the indicated years:

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **DR. SEHAT SUTARDJA, PH.D.** | | | | | | | | | |
| Chairman, President and CEO | 2013 | 841,346 | - | 3,040,000 | / | 8,751,750 | - | 1,517 | 12,634,613 |
| Chairman, President and CEO | 2012 | 783,076 | - | - | / | 11,324,040 | 180,000 | 283,056 | 12,570,172 |
| Chairman, President and CEO | 2011 | 691,731 | 1,200,000 | 6,489,747 | / | 2,443,275 | - | 5,186 | 10,829,939 |
| Chairman, President and CEO | 2010 | 657,000 | 985,000 | - | / | - | - | 574 | 1,642,574 |

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Chairman, President and CEO | 2009 | 88,443 | - | - | / | 2,162,230[14] | - | 30,600 | 2,281,273[15] |
| Chairman, President and CEO | 2008 | 533,435 | - | - | / | 7,254,923[16] | 13,500 | 12,267 | 7,814,125[17] |
| Chairman, President and CEO | 2007 | 557,000[18] | - | / | / | 9,704,258 | / | 25,000 | 10,286,258[19] |
| Chairman, President, CEO | 2006 | 500,000 | 58,750 | / | - | / | / | 1,000 | |
| Chairman, President and CEO | 2005 | 500,000 | 36,000 | / | - | / | / | 500 | |
| Chairman, President and CEO | 2004 | 500,000 | 21,750 | / | 1,500,000 | / | / | - | |
| Co-Chairman of the Board, President, CEO | 2003 | 500,000 | 13,000 | / | 200,000 | / | / | - | |

[14]  According to Marvell's 2010 proxy statement, at p.32, the value of these option awards was revised in 2010 to $1,874,256 to reflect a new grant date fair value in accordance with revised SEC disclosure requirements. The amounts do not represent the actual amounts paid to or realized by the named executive officer.

[15] This total compensation figure was adjusted by Marvell in 2010 to $1,993,299, as stated in the Company's 2010 proxy statement. The adjustment was again made to conform to new SEC disclosure requirements.

[16]  According to Marvell's 2010 proxy statement, at p.32, the value of the option awards was revised to $2,529,354 to reflect a grant date fair value in accordance with new revised SEC disclosure requirements. The amounts do not represent the actual amounts paid to or realized by the named executive officer.

[17] Total compensation adjusted to $3,088,556 in the 2010 proxy statement to reflect new SEC disclosure rules.

[18]  According to Marvell in their 2008 proxy statement, at p.29, the value was retroactively adjusted to $566,397 and was made to the executives effective as of January 31, 2006.

[19] Total compensation figure was subsequently adjusted by Marvell to $10,297,155, as stated in the 2008 proxy statement, to reflect new SEC rules.

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **WEILI DAI** | | | | | | | | | |
| President of Marvell Technology Group, Inc. | 2013 | 510,000 | - | Option to purchase common shares and RSU[20] | / | - | - | - | |
| Employee of MSI and former Executive VP and COO | 2012 | 510,000 | 400,000 | Option to purchase common shares and RSU[21] | / | - | - | - | |
| Employee of MSI and former Executive Vice President and COO | 2011 | 500,000 | 480,000 | Option to purchase common shares[22] | / | - | - | - | |
| Employee of MSI and former Executive Vice President and COO | 2010 | 480,000 | 450,000 | Option to purchase 100,000 common shares and 30,000 RSUs as well as a RSU for 236,518 shares[23] | / | - | - | - | |

---

[20]   According to the 2013 proxy statement, at p.50, the audit committee and executive compensation committee approved the grant to Ms. Dai of (A) an option to purchase 450,000 common shares at fair market value on the date of grant and with service-based vesting 1/3 annually beginning on the second anniversary of the vesting commencement date, which was April 1, 2013, (B) 60,000 RSUs with service-based vesting that vest in full on April 1, 2014, and (C) 100,000 performance-based RSUs based on certain performance metrics for fiscal 2014. The value of such shares and RSU were not provided by Marvell.

[21]   According to the 2012 proxy statement pg.54, the audit committee and executive compensation committee approved the grant to Ms. Dai of (A) an option to purchase 800,000 common shares at fair market value on the date of grant and with service-based vesting, (B) 80,000 RSUs with service-based vesting. The value of such shares and RSU were not provided by Marvell.

[22]   According to the 2011 proxy statement pg.55, the audit committee and executive compensation committee approved the grant to Ms. Dai of (A) an option to purchase 180,000 common shares at fair market value on the date of grant and with time-based vesting, (B) an option to purchase 360,000 common shares, with vesting of the shares conditioned on the achievement of market-based price target for the Company's common shares. The value of such shares and RSU were not provided by Marvell.

[23]   According to Marvell's 2010 proxy statement, at p.40, the audit committee and executive compensation committee approved the grant to Ms. Dai of (A) an option to purchase 100,000 common shares at fair market value on the date of grant and with time-based vesting, (B) a RSU award for 30,000 common shares with time-based vesting, and (C) RSU award for up to 236,518 common shares, with the number of shares to vest to be subject to the achievement of

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Employee of MSI[24][25] | 2009 | 450,000 | - | Option to purchase common shares[26] | / | - | - | - | |
| Employee of MSI[27] and former Executive VP and COO[28] | 2008 | 280,962 | - | - | / | 7,387,067 | 500 | 3,582 | 7,672,111 |
| Executive Vice President and COO[29] | 2007 | 481,000[30] | - | / | / | 6,888,798 | / | 4,000 | 7,373,798[31] |
| COO, Secretary and Director | 2006 | 375,000 | 250 | / | - | / | / | 1,000 | |

performance objectives related to growth in revenue of a specific business group in fiscal years 2011 and 2012, subject to a minimum level of such revenue growth over the two-year period. The value of such shares and RSU were not provided by Marvell.

[24] Marvell Semiconductor, Inc. ("MSI") is a subsidiary of Marvell Technology Group, Inc.

[25] Ms. Dai served as the Vice President of Sales for Communications and Consumer Business, Vice President, General Manager of Communications and Computing Business Unit of MSI.

[26] According to the 2009 proxy statement pg.38, Ms. Dai was granted by the executive compensation committee an option to purchase 200,000 common shares at fair market value on the date of grant. The value of such shares and RSU were not provided by Marvell.

[27] Ms. Dai transitioned into a position as Director of Strategic Marketing and business Development of MSI. On May 31, 2008, Ms. Dai was appointed as Vice President of Sales for Communications and Consumer Business of MSI.

[28] Beginning in 2007, Ms. Dai officially resigned from her position as an executive officer of the Company as a result of her settlement agreement with the SEC relating to the options backdating scandal at Marvell. The SEC settlement barred Dai from serving as an executive officer of Marvell for five (5) years. However, Dai immediately was given a high-level position with Marvell and/or MSI, although the exact nature of her job title and role at Marvell was not disclosed in Marvell's proxy statements.

[29] Ms. Dai resigned as Executive Vice President and Chief Operating Officer and from the board of directors on May 6, 2007.

[30] According to Marvell in their 2008 proxy statement pg.29, the value has been retroactively adjusted to $487,802 and was made to the executives effective as of January 31, 2006.

[31] Total compensation adjusted to $7,380,600 as stated in the 2008 proxy statement.

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Executive VP, Secretary and Director | 2005 | 375,000 | - | / | - | / | / | 500 | |
| Executive VP, Secretary and Director | 2004 | 375,000 | - | / | 1,000,000 | / | / | - | |
| Executive VP, Secretary and Director | 2003 | 375,000 | 250 | / | 100,000 | / | / | - | |
| **PANTAS SUTARDJA** | | | | | | | | | |
| VP, Chief Technology Officer and Chief R&D Officer | 2013 | 423,442 | - | 638,400 | / | 1,983,730 | - | 3,517 | 3,049,089 |
| VP, Chief Technology Officer and Chief R&D Officer | 2012 | 413,292 | - | - | / | 2,426,580 | 24,960 | 156,030 | 3,020,862 |
| VP, Chief Technology Officer and Chief R&D Officer | 2011 | 400,000 | 180,000 | 446,794 | / | 488,655 | - | 2,990 | 1,518,439 |
| Technology Officer and Chief R&D Officer | 2010 | 400,000 | 160,000 | - | / | - | - | 38,113 | 598,113 |
| VP, Chief Technology Officer and Chief R&D Officer | 2009 | 53,847 | - | - | / | 1,181,290[32] | - | 1,384 | 1,236,521[33] |

---

[32] In 2010, according to Marvell's 2010 proxy statement, at pg.32, Marvell revised the reported value of the option awards to $312,168 to reflect a new grant date fair value in accordance with revised SEC disclosure requirements. As is stated in the Proxy Statements, the amounts do not represent the actual amounts paid to or realized by the named executive officer.

[33] In 2010, according to Marvell's 2010 proxy statement, at pg.32, Marvell revised the reported value of Dai's total 2009 compensation to $367,399, again to reflect new SEC disclosure requirements regarding executive compensation.

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

| Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Securities Underlying Options (#) | Option Awards/ Adj. ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| VP, Chief Technology Officer, Acting Chief Operating Officer, Chief R&D Officer | 2008 | 383,077 | - | - | / | 3,157,548[34] | 24,500 | 2,017 | 3,567,142[35] |
| Chief Technology Officer | 2007 | 400,000[36] | - | / | / | 4,652,587 | / | 34,000 | 5,086,587[37] |
| Chief Technology Officer and Director | 2006 | 300,000 | 10,250 | / | - | / | / | 1,000 | |
| Chief Technology Officer and Director | 2005 | 300,000 | 30,000 | / | - | / | / | 500 | |
| Chief Technology Officer and Director | 2004 | 300,000 | 18,000 | / | 660,000 | / | / | - | |
| VP and Director | 2003 | 300,000 | 1,500 | / | 100,000 | / | / | - | |

125.     A substantial portion of this compensation was unjust and unearned because these individual defendants caused Marvell to willfully infringe CMU's patents.  But for the willful infringement of CMU's patents, Marvell's revenues, earnings per share, and profit margins (both on an absolute basis and compared to its peers) would have been substantially lower.  In the

---

[34] According to Marvell in their 2010 proxy statement pg.32, the value of the option awards has been revised to $1,073,993 to reflect grant date fair value in accordance with the revised SEC disclosure requirements. The amounts do not represent the actual amounts paid to or realized by the named executive officer.

[35] Total compensation adjusted to $1,483,587 as stated in the 2010 proxy statement.

[36] According to Marvell in their 2008 proxy statement pg.29, the value has been retroactively adjusted to $405,385 and was made to the executives effective as of January 31, 2006.

[37] Total compensation adjusted to $5,091,972 as stated in the 2008 proxy statement.

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

CMU litigation, CMU expert witness Lawton demonstrated, and the jury agreed, that Marvell realized an excess profit per infringed chip of between $0.06 and $.72.  It was stipulated by the parties at trial that Marvell sold 2,338,280,543 chips which infringed CMU's patents from March 6, 2003 through the date of the trial in December 2012.  The average price per chip was $4.42 and the operating profit per chip was $2.16, based on Marvell's sales data produced at trial. Expert witness Lawton calculated the excess profit per infringed chip of between $0.06 and $.72 by looking at both the sales data and then comparing same to Marvell's gross margin, operating income and excess profits from 2000 to 2013 of the chips that were sold by Marvell which infringed CMU's patents (the MNP and NLD chips), and found that Marvell made approximately a 59.6% profit on its gross margins.  Based on this data and these calculations, Lawton concluded that Marvell received $0.42 of "excess profits" from its sales of the chips. Relying in part on her calculations of the excess profits benchmark of $0.42 per unit, and the operating profit benchmark of $0.06 to $0.72 per unit, and considering other relevant factors, Lawton opined that a reasonable royalty that Marvell should have paid CMU was $0.50 per chip. The jury agreed with Ms. Lawton, CMU's expert, and awarded CMU $1.17 billion in damages.

126.    This data and evidence is sufficient to demonstrate that Marvell's earnings, revenues, profits and profit margins, earnings per share, and other metrics were materially inflated during the relevant time period.  As a result, the performance-based compensation awarded by Marvell (acting through the Executive Compensation Committee, composed of Defendants Gromer, Kassakian, and Krueger) to Defendants Sehat and Pantas Sutardja, and to Weili Dai, was excessive, unearned, unjust, and inequitable.  Not only did such Defendants not earn the performance-based compensation, but they procured it through dishonesty, fraud, and willful infringement of CMU's patents.  As a result, it would be inequitable for them to retain the compensation, and such compensation should be returned to Marvell.

127.    Marvell's policy regarding recoupment of bonuses following a restatement also supports the fact that the above-referenced compensation is unjust, unearned, and should be returned.  Marvell has a policy that its CEO and CFO should return bonuses if the company

restates its financial results and the bonuses would have been lower taking into consideration the

restatement, and if the disinterested members of the Board determine that the restatement was

caused in whole or part by gross recklessness or intentional misconduct of the CEO or CFO. This

policy acknowledges that it would be inequitable for the Company's officers to retain bonuses or

other compensation that would not have been earned, or which would have been lower, due to

reckless or intentional misconduct by the officer.  This policy supports disgorgement or return of

the compensation of Sehat and Pantas Sutardja and Weili Dai.   The CMU judgment constitutes a

de facto restatement of Marvell's financial results since the $1.17 billion judgment, as indicated

*supra*, was based directly on damages calculations by CMU's expert which demonstrated that

Marvell achieved artificially high profits, revenues, and earnings per share directly as a result of

its sales of the infringed chips.

## DEFENDANTS' CONDUCT THREATENS THE PAYMENT OF DIVIDENDS TO MARVELL'S CURRENT SHAREHOLDERS

128.    In May 2012, Marvell announced the initiation of paying its first quarterly

dividend of $0.06 per share. Marvell's board of directors declared quarterly cash dividends

of $0.06 per share payable to holders of the Company's common shares in each of the last

three quarters of fiscal 2013. As a result, cash dividends of $31.7 million were paid in the

three months ended February 2, 2013 and a total of $98.8 million were paid in the fiscal

year ended February 2, 2013.

129.    On February 24, 2014, however, Marvell filed the following Form 8-K with

the SEC disclosing that the CMU judgment has impaired or may impair its ability to pay

future dividends to its shareholders:

> "On February 20, 2014, Marvell announced that it had declared the payment of its
> quarterly dividend of $0.06 per share to be paid on March 27, 2014 to all
> shareholders of record as of March 13, 2014. Developments in the CMU litigation
> could affect Marvell's ability to pay the dividend on March 27, 2014 under
> Bermuda law, where Marvell is incorporated. In such event, the payment of the
> dividend could be delayed until such time as Marvell can meet statutory
> requirements under Bermuda law. The payment of future quarterly cash dividends

is subject to, among other things, the best interests of its shareholders, its results of operations, cash balances and future cash requirements, financial condition, statutory requirements of Bermuda law, and other factors that the board of directors may deem relevant."

130.    On August 19, 2010, a year after being sued by CMU, the Individual Defendants caused Marvell to embark on a $500 million stock repurchase plan.  In short order, as the CMU litigation progressed, the Individual Defendants caused Marvell to quadruple the size of the plan to $2 billion.  By May 2012, Marvell had repurchased $1.7 billion of the $2 billion authorized repurchases.  On May 17, 2012, Marvell authorized another $500 million in repurchases of its own stock in a press release issued from its headquarters in Santa Clara, CA which stated:

"Marvell has repurchased approximately $1.7 billion of its previously authorized $2 billion program leaving about $348 million remaining in the current repurchase program. With the new $500 million authorization the total repurchase program increases to $2.5 billion and the amount remaining to $848 million. Marvell has repurchased and retired over 107 million shares, or about 16 percent, of the outstanding shares since the initial announcement of the share repurchase program in August 2010."

131.    Analysts have been critical of the stock repurchase plan.  Many have noted that its announcement coincided with the CMU litigation.

132.    On December 18, 2012, as the CMU litigation was nearing its end, the Individual Defendants caused Marvell to increase the share repurchases by another $500 million.

133.    The massive increases in the share repurchase program represents a direct risk to, and infringement of, the shareholders' potential dividends.  If Marvell is forced to pay the CMU judgment, there will not be sufficient cash reserves at Marvell to pay dividends.  The defendants' wrongful conduct thus has caused damage to the personal rights of Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this action on his own behalf and as a class action pursuant to §382 of the California Code of Civil Procedure on behalf of all holders of Marvell stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

135.    This action is properly maintainable as a class action.

136.    The Class is so numerous that joinder of all members is impracticable. According to Marvell's SEC filings, there were 496,922,801 shares of Marvell common stock outstanding as of April 29, 2013.

137.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class as a result of their conduct with respect to the CMU's patents and the CMU litigation;

(b)    whether defendants' conduct has benefitted themselves to the detriment of Plaintiffs and the Class;

(c)    whether defendants' conduct threatens the dividends to be declared and paid to Plaintiff and the Class;

(d)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with their handling of the CMU patents and CMU litigation, including the duties of good faith, diligence, candor and fair dealing; and

(f)    whether Plaintiffs and the Class are entitled to declaratory, injunctive, and/or monetary relief, and if so the appropriate form and/or amount of such relief.

138.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

139.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

140.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

141.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

142.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE ALLEGATIONS

143.    Plaintiff also brings this action derivatively for the benefit of Marvell to redress injuries suffered, and yet to be suffered, by Marvell as a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, violations of California Corporations Code, waste of corporate assets and unjust enrichment. Marvell is named in this action as a Nominal Defendant solely in a derivative capacity.

144.    Plaintiff is a current Marvell shareholder and has continuously held Marvell stock at all relevant times.

145.    Plaintiff will fairly and adequately represent the interests of the Company and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

146.   This action is not a collusive one to confer jurisdiction on a court that it would not otherwise have.

**I.   THE DERIVATIVE CLAIMS ARE AUTHORIZED UNDER *FOSS V. HARBOTTLE* BECAUSE DEFENDANTS' WRONDOING HAS INFRINGED UPON THE SHAREHOLDERS' PERSONAL RIGHTS AND BECAUSE DEFENDANTS' CONDUCT WAS *ULTRA VIRES***

147.   Marvell is a Bermuda corporation.  Bermuda follows the *Foss v. Harbottle* decision, 2 Hare 461 (Eng. 1843), in determining the circumstances under which a company's shareholders may maintain a derivative action.  Under *Foss v. Harbottle*, a derivative action may be maintained if the individual defendants' wrongdoing infringes upon the personal rights of the company's shareholders, as opposed to rights belonging to the company itself.

148.   Here, the Individual Defendants' fraud has infringed upon the shareholders' personal rights because it has jeopardized the shareholders' expectations and right to dividends.  Dividends belong to the shareholders, not the corporation.  Thus, wrongdoing which impairs the company's ability to declare and pay dividends infringes on the shareholders' personal rights.

149.   On February 24, 2014 Marvell filed the following Form 8-K with the SEC disclosing that the CMU judgment has impaired or may impair its ability to pay future dividends to its shareholders:

> "On February 20, 2014, Marvell announced that it had declared the payment of its quarterly dividend of $0.06 per share to be paid on March 27, 2014 to all shareholders of record as of March 13, 2014. Developments in the CMU litigation could affect Marvell's ability to pay the dividend on March 27, 2014 under Bermuda law, where Marvell is incorporated. In such event, the payment of the dividend could be delayed until such time as Marvell can meet statutory requirements under Bermuda law. The payment of future quarterly cash dividends is subject to, among other things, the best interests of its shareholders, its results of operations, cash balances and future cash requirements, financial condition, statutory requirements of Bermuda law, and other factors that the board of directors may deem relevant."

150.    A shareholder derivative action is also authorized under the facts of the present case because the defendants' conduct constitutes *ultra vires* acts, which is another specific exception under *Foss v. Harbottle* permitting a derivative claim.  The directors and officers of Marvell were not permitted under Marvell's Memorandum of Association[38] and bylaws to willfully infringe CMU's patents.  Because they did so under circumstances constituting fraud and dishonesty, their conduct constituted *ultra vires* action.

151.    The defendants also acted *illegally and unlawfully* by causing the Company to willfully infringe patents owned by CMU, subjecting the Company to a judgment in excess of $1 billion.

152.    The defendants also acted in a *dishonest manner* because they lied to Marvell's shareholders about the Company's infringement of CMU's patent, as alleged specifically supra.

153.    The defendants also acted in a *dishonest manner* because they engaged in self-dealing.  By willfully infringing CMU's patent and wrongfully refusing to pay royalties and/or licensing fees to CMU for the patent, the defendants artificially increased Marvell's stock price and reported revenues and earnings.  As a result, and as detailed in this complaint, the defendants wrongfully appropriated to themselves salaries, incentive-based compensation, stock, stock options, bonuses, and other benefits which were unjust, unearned, inequitable, and which should be returned to the Company.  Through their actions, and with intent to benefit themselves at the expense of the Company and its shareholders, the defendants engaged in self-dealing and acting dishonestly, thus breaching their duties of good faith, fair dealing, honesty and candor.

---

[38] Marvell's Memorandum of Association is the functional equivalent of Articles of Incorporation.

154.   Marvell may not indemnify the Individual Defendants for their wrongdoing since the wrongdoing involves dishonesty and/or fraud, as those terms are used under Bermuda law.   Article 30 of Bermuda's Third Amended and Restated Bye-laws specifically states that Marvell may not indemnify any of its officers or directors for "fraud or dishonesty which may attach to any of said persons."

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

155.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

156.   The Individual Defendants owed and owe Marvell fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Marvell the highest obligation of good faith, fair dealing, loyalty and due care.  Under Bermuda law, all of Marvell's officers and directors, in exercising their powers and discharging their duties, must act honestly and in good faith with a view to Marvell's best interests and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

157.   The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith, and acted in a dishonest manner, by engaging in one or more of the following acts: (a) causing or allowing the Company to willfully infringe patents held by CMU; (b) disseminating to Marvell shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, and other public statements and disclosures as detailed herein; (c) approving or receiving compensation which was unjust and unearned because the compensation was based on revenues, earnings and profits which were inflated due to Marvell's willful infringement of CMU's patents; and (d) failing to reasonably settle the CMU litigation once liability became apparent.  Further, each of the Individual Defendants failed to correct the Company's publicly reported

financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment.

158.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN ADEQUATE INTERNAL CONTROLS

159.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.   As alleged herein, each of the Defendants had a fiduciary duty to, *inter alia*, exercise good faith to ensure that the Company had adequate internal controls.   One of the most important internal controls at Marvell concerned patents and ensuring that Marvell did not infringe others' intellectual property and patents.  As demonstrated in the CMU litigation, Marvell did not have effective internal controls concerning patents and/or did not follow its own internal policies concerning investigation of patents when it received notice of CMU's patents. Its failure to follow its own internal policies, or perform any investigation as to whether it was violated CMU's patents, was one of the reasons the jury found willful infringement by Marvell.

161.   The Individual Defendants willfully ignored the obvious and pervasive problems with Marvell's internal controls and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

162.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained significant damages, as alleged herein.

## COUNT III
## AGAINST DEFENDANTS SEHART SUTARDJA, PANTAS SUTARDJA, AND WEILI DAI FOR UNJUST ENRICHMENT

163.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    By their wrongful acts and omissions, Defendants Sehart Sutardja, Pantas Sutardja, and Weili Dai were unjustly enriched at the expense, and to the detriment, of Marvell.

165.    Plaintiff, as a shareholder and representative of Marvell, seeks restitution from such Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by such Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

166.    Plaintiff on behalf of Marvell has no adequate remedy at law.

**COUNT IV**
**AGAINST DEFENDANTS  SEHAT AND PANTAS SUTARDJA AND WEILI DAI**
**FOR BREACH OF DUTY OF HONEST SERVICES**

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    This claim is brought derivatively on behalf of the Company against Defendants Sehat Sutardja, Pantas Sutardja, and Weili Dai for breach of their undivided duty of loyalty to their employer, Marvell.

169.    Sehat and Pantas Sutardja and Weili Dai were employees of Marvell.

170.    As alleged above, Sehat and Pantas Sutardja and Weili Dai breached their duty of loyalty to Marvell by not acting solely in Marvell's interests in performing their employment duties.

171.    Those breaches of duty consisted of the conduct alleged throughout this complaint including, without limitation, Defendants' causing the Company to willfully infringe patents held by CMU, causing the Company to make false statements to the market that misrepresented the Company's patents, compliance with the law, business and financial prospects and by direct participation in willfully infringing CMU's patents.    Sehat and Pantas Sutardja and Weili Dai benefitted from their wrongdoing because they received compensation that was directly tied to the company's financial performance.

172.    Marvell was harmed by these Defendants' breaches of their undivided duty of loyalty.

173.    By reason of the foregoing, Marvell was harmed and will continue to suffer harm as described in greater detail above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief, as follows:

A.    A judgment against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other wrongdoing;

B.    Directing Marvell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Marvell and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to strengthen the Company's internal controls over patent laws and procedures to be followed to ensure that the Company does not infringe patents held by others;

- a provision to permit the shareholders of Marvell to nominate at least two candidates for election to the Board; and

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding patent, accounting, internal controls and auditing matters.

C.    Extraordinary equitable and/or injunctive relief as permitted by law and equity;

D.    Awarding to Marvell restitution from the Defendants, and each of them, and

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT

1  ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants

2  due to the willful infringement of CMU's patents;

3      E.      Awarding to Plaintiff the costs and disbursements of the action, including

4  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

5      F.      Granting such other and further relief as the Court deems just and proper.

6                          **JURY TRIAL DEMANDED**

7      Plaintiff hereby demands a trial by jury on all claims so triable.

8

9  Dated : April 7, 2014                    Respectfully submitted,

10                                           BOTTINI & BOTTINI, INC.
                                            Francis A. Bottini, Jr. (SBN 175783)
11                                          Albert Y. Chang (SBN 296065)
                                            Yury A. Kolesnikov (SBN: 271173)
12
                                                      /s/ Francis A. Bottini, Jr.
13                                                    Francis A. Bottini, Jr.

14                                          7817 Ivanhoe Avenue, Suite 102
15                                          La Jolla, California  92037
                                            Telephone:  (858) 914-2001
16                                          Facsimile:   (858) 914-2002
                                            E-mail:      fbottini@bottinilaw.com
17                                                       achang@bottinilaw.com
                                                         ykolesnikov@bottinilaw.com
18
19                                          *Attorneys for Plaintiff Lee Voss*

20

21

22

23

24

25

26

27

28

CLASS AND SHAREHOLDER DERIVATIVE COMPLAINT